307 F.2d 242
 TEXAS CONTINENTAL LIFE INSURANCE COMPANY, Plaintiff-Appellee,
v.
Charles D. DUNNE and J. E. Dunne, II, Defendants-Appellants.
TEXAS CONTINENTAL LIFE INSURANCE COMPANY, Plaintiff-Appellee,
v.
The BANKERS BOND COMPANY, Inc., and Elinore Sedley,
Defendants-Appellants.
 Nos. 14596, 14597.
 United States Court of Appeals Sixth Circuit.
 Aug. 7, 1962, As Amended Aug. 15, 1962, Rehearing Denied
Sept. 27, 1962.
 
 Arthur W. Grafton, Louisville, Ky. (A. Berkowitz, Birmingham, Ala., H. Wendell Cherry, Louisville, Ky., Charles J. Najjar, Birmingham, Ala., on the brief, Wyatt, Grafton & Sloss, Louisville, Ky., Berkowitz, Lefkovits & Paden, Birmingham, Ala., of counsel), for Bankers Bond Co.
 Henry R. Heyburn, Louisville, Ky. (Mark Davis, Jr., Louisville, Ky., Ira Lee Allen, Dallas, Tex., on the brief, Marshall, Cochran, Heyburn & Wells, Louisville, Ky., Thompson, Coe, Cousins & Irons, Dallas, Tex., of counsel), for Texas Continental Life.
 Henry J. Stites, Louisville, Ky., for Charles D. Dunne and J. E. Dunne II.
 Before CECIL and WEICK, Circuit Judges, and BOYD, District Judge.
 WEICK, Circuit Judge.
 
 
 1
 This appeal is from an order granting plaintiff's motion, filed pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A., for judgment in accordance with its motion for a directed verdict made at the close of all the evidence and after the jury had disagreed and a mistrial had been declared. The order was in conformity with the opinion of the District Judge reported in 187 F.Supp. 15.
 
 
 2
 Plaintiff's complaint contained two counts, one at common law for fraud and the second for conspiracy to violate the Federal Securities Act of 1933, as amended, the Federal Securities Exchange Act of 1934, as amended, and Rule X-10B-5 of the Federal Securities and Exchange Commission, in the sale of municipal bonds issued by the City of West Buechel, Kentucky, a city of 350 to 400 people.[1] Since the judgment of the District Court was based solely on the second count, we will consider only that count.
 
 
 3
 The lawsuit grows out of the purchase by plaintiff on April 29, 1955 of $100,000 face value 'Waterworks, Sewer, Drainage and Street Revenue Bonds of the City of West Buechel' for which plaintiff paid $103,000 and which it seeks to recover claiming that the bonds were invalid and worthless. The bonds were part of an issue of $2,000,000 dated March 15, 1954.
 
 
 4
 The bonds were issued for the purpose of providing funds to construct a waterworks, sewer, drainage and street system for the City with reserve facilities for water plant distribution and storage from which revenue would be derived to create a sinking fund for the payment of interest and retirement of the bonds. A sinking fund was to be maintained from the proceeds of sale to pay interest.
 
 
 5
 The City contracted with Bankers Bond Company to do all the work incident to the issuance of the bonds, including the preparation of resolutions, contracts, minutes and notices and Bankers was to pay all expenses in connection therewith for which it would receive a commission equal to any sum over par received for such bonds up to 3% of the face amount of all bonds sold. The contract recited that it would 'be futile to have a public sale of the bonds' and that Kentucky statutes permitted the City to sell the bonds in such manner and upon such terms as it deemed best. The contract provided that of necessity title to the bonds must technically pass to Bankers which in turn would pass title to the purchaser upon receipt of an offer above par. A circular setting out the opinion of its attorney was issued by Bankers. The bonds were printed by Dunne Press of which Charles D. Dunne was an officer.
 
 
 6
 The bonds were sold by Bankers through Charles D. Dunne as its agent to Jack Cage and Company of Dallas, Texas and were sent from Louisville, Kentucky to Dallas, Texas in a commercial airplane. Cage paid $335,000 in cash and executed an instalment note for $1,725,000 payable in seven equal annual instalments commencing March 15, 1956 with interest at 5% per annum. The note provided that, with the exception of the first instalment, all other instalments of principal or interest may be paid in cash or by the transfer without recourse to the holder of the note of Revenue Bonds issued by the City of West Buechel. The note was secured by an assignment of even date of an interest in a commission agreement and payment was guaranteed by an insurance company affiliated with Cage. Bankers assigned the note to the City. The ordinance passed by the Board of Trustees of West Buechel authorizing the sale of the bonds on credit contained no mention of the right reserved by Cage to transfer bonds as payments on the note.
 
 
 7
 Bankers received a fee of $60,000 from the cash payment. Out of this sum it paid $20,000 to Arlie Baker of Detroit as a 'finders fee.' Mr. Baker's connection with the transaction was that he was the husband of the former wife of Charles D. Dunne and the step-father of J. E. Dunne, II. The law firm of Col. Henry J. Stites, Bankers' attorney, received $10,000 for legal services and Bankers kept $30,000. The City of West Buechel received the balance of $275,000. Cage promised to pay the Dunnes $100,000 for their assistance in the transaction of which $25,000 was paid in cash to them and the balance was promised to be paid in deferred instalments. About two-thirds of the money received by the City was spent on improvements which benefited lands owned by corporations controlled by Mrs. Elinore Sedley who also controlled Bankers.
 
 
 8
 After the sale of the bonds to Cage, Charles D. Dunne and J. E. Dunne, II sought to resell some of the bonds for Cage on a commission basis. Charles D. Dunne introduced Ben Jack Cage of Jack Cage & Co. to Bevie F. Biggers who purchased the bonds acting as agent for plaintiff.
 
 
 9
 Only two payments were made as credits on the note which were made by draft drawn on a Dallas bank and transmitted by mail to a bank in Louisville, Kentucky and the note became in default.
 
 
 10
 The bonds were not advertised for sale or offered to investors through the normal channels. Since the City received only a small part of the proceeds of sale it did not have funds to construct the improvements for the payment of which the bonds had been issued. Without the improvements the City was unable to collect revenue to create a sinking fund for the payment of interest and principal for the retirement of the bonds.
 
 
 11
 There were a number of irregularities in the issuance and original sale of the bonds, but the principal ones relied on were the sale on credit to Cage and the provision in the note giving Cage the right to pay it by the transfer of the bonds. In reality this was a sale of only $335,000 of the bonds since the purchaser could rescind as to the balance by tendering back the bonds to the holder of the note.
 
 
 12
 Plaintiff claims that the defendants conspired to violate the law by bringing into existence this issue of bonds and launching it into the channels of trade by a series of interstate transactions and use of the mails whereby some of the bonds were sold to plaintiff who was an innocent purchaser. Specifically, it was claimed that defendants omitted to state material facts which were necessary in order to make the prospectus which had been issued not misleading. The material facts which plaintiff claims defendants omitted to state were the sale of the issue on credit and the provision in the note authorizing transfer of bonds in payment.
 
 
 13
 Defendants did not deny the sale on credit to Cage or the provisions in the note giving him the right to transfer bonds as payments of the note. They did deny that they had omitted to state material facts and claimed that Mr. Biggers was fully advised of all of these facts before he made the purchase.
 
 
 14
 Whether Biggers had knowledge of these facts was a vital issue in the case which was bitterly contested before a jury. Biggers testified that he relied on the provisions of the bonds, the prospectus and statements made to him by the Dunnes and did not know of the prior sale of the issue on credit to Cage and if he had known he would not have purchased the bonds for the plaintiff.
 
 
 15
 Charles D. Dunne testified as follows concerning knowledge of Mr. Biggers of the sale to Cage on credit:
 
 
 16
 'Q. Now, you did talk to Mr. Biggers about these bonds from Cage did you not?
 
 
 17
 'A. I have testified so many times on this point. Mr. Biggers wanted to meet Mr. Cage. He knew all about the bonds--
 
 
 18
 'Q. You just didn't talk to him about it?
 
 
 19
 'A. I set up a meeting with Mr. Cage and I was there when he brought the bonds. I was very much surprised Mr. Cage would buy that big wad of Texas Continental stock, and I didn't talk to him about it, but he did know they were bought on credit because I tried to borrow on the contract and I explained it to him.' James E. Dunne, II testified:
 
 
 20
 'Q. Please tell the jury as best you recollect what you told Mr. Biggers about the West Buechel bonds.
 
 
 21
 'A. Well, as has been stated, it was an unusual transaction, therefore worthy of note, and I had told Mr. Biggers of the fact that Jack Cage and Company had purchased the Two Million bond issue in its entirety.
 
 
 22
 I told him also of the circumstances under which Jack Cage and Company made it over, told him of the fact that they had paid $275,000 in cash, that they had executed a note for a million, seven hundred twenty-five, that they had paid I believe it was 3 points or $60,000 above the par value, and that this million, seven hundred twenty-five thousand dollars would be paid in 7, I believe it was 7, instalments, of approximately a quarter of a million dollars each, and that with the cash the City of West Buechel would receive, that certain improvements would be constructed, that this was a relatively undeveloped area, which was a fact well known.
 
 
 23
 'Q. Now, you understand that you are under oath, do you not? Sir?
 
 
 24
 'A. Yes, sir.
 
 
 25
 'Q. Do you swear to this jury that you told these facts to Mr. Biggers before the Texas Continental Life Insurance Company purchased those bonds from Jack Cage and Company?
 
 
 26
 'A. Most assuredly * * *.'
 
 
 27
 James Dunne, Sr. testified as to a conversation with Mr. Biggers several months after the sale as follows:
 
 
 28
 'Q. Did he (Biggers) have any discussion with you on the occasion of that trip about West Buechel bonds?
 
 
 29
 'A. Yes. He knew quite a bit about them.
 
 
 30
 'Q. What did he tell you about West Buechel bonds on that trip?
 
 
 31
 'A. He told me that he had acquired a number of those for Texas Continental Insurance Company, San Antonio, and that he considered them a good bond and that Ben Jack Cage, that he got them fromsaid he went and solicited Ben Jack Cage for them. He thought he made a pretty good deal and that Ben Jack Cage had told him that. He said-- he asked me if I knew about Ben Jack Cage buying them on time and I said no. And he said, well, he put about 20 to 25% up on them, and he didn't see why we couldn't do that in my deal over in Arizona.'
 
 
 32
 In considering the issue of knowledge we must view the evidence as well as the inferences properly deducible therefrom in the most favorable light to the defendants. The trial court may not weigh the evidence or find the facts. The court may grant the motion under 50b only when a question of law is presented. Hamilton Foundry & Machine Co. v. International Union, 193 F.2d 209 (CA 6), certiorari denied 343 U.S. 966, 72 S.Ct. 1060, 96 L.Ed. 1363.
 
 
 33
 The testimony of James E. Dunne, II tended to prove that Mr. Biggers had knowledge of the sale on credit to Cage. The testimony of Charles D. Dunne that Biggers 'knew all about the bonds' and 'did know they were bought on credit because * * * I explained it to him' is of little value because it contains Mr. Dunne's conclusions which are not evidence. He should have related the conversation and not his conclusions. Nor do we accept as evidence of knowledge of the sale on credit the testimony of James Dunne, Sr. relating admissions made by Mr. Biggers to him some months after the sale. In our judgment, Mr. Biggers' statements to Mr. Dunne, Sr. were not part of the res gestae and Biggers had no authority after the sale to bind plaintiff with his admissions. Westmoreland v. Memphis Transit Company, 305 F.2d 71 (CA 6). Even if the evidence was admissible for impeachment purposes, it still would not be competent to prove the fact of knowledge. Bridges v. Wixon, 326 U.S. 135, 153, 65 S.Ct. 1443, 89 L.Ed. 2103; Birdsong v. Commonwealth, 289 Ky. 521, 159 S.W.2d 41; Commonwealth v. Strunk, Ky., 293 S.W.2d 629.
 
 
 34
 It is strenuously argued by plaintiff that these conversations did not reveal to Mr. Biggers that the note contained a provision authorizing the transfer of bonds for payment on the note. But this testimony, if believed, did disclose the sale of $2,000,000 of revenue bonds on credit payable over a period of seven years with a down payment of only $335,000. This evidence tended to prove knowledge on the part of Mr. Biggers of the irregularity of the bond issue because the City obviously could not construct the improvements without the proceeds of the bond issue and could not obtain revenue to pay the interest and principal of the bonds without the completed improvements from which the revenue could be obtained. As we view it, even if the provisions of the note relative to payment by transfer of the bonds had been disclosed to Biggers he would merely have been in possession of additonal evidence as to the irregularities of the bond issue.
 
 
 35
 Cage had paid $335,000 in cash for the bonds. It was the default made by Cage in meeting the balance of the payments of principal and interest on the note which deprived the City of funds to meet its commitments under the bond issue. There was no evidence that Cage tendered bonds to the City as payment on the note.
 
 
 36
 It was not for us to weigh the evidence in this case or to determine whether the testimony of the Dunnes is worthy of belief. This is solely the function of the jury.
 
 
 37
 The District Court handed down a memorandum opinion in the companion case of All States Investors Co. on the same day its opinion in the present case was rendered. The opinion in the All States Investors Co. case is set forth in footnote 2.
 
 
 38
 This companion case was consolidated and tried with the cases at bar. The ruling in All States Investors Co. would seem to apply to the case at bar if the conversations between Charles D. Dunne and James E. Dunne, II, above set forth, took place before the bonds were purchased by Biggers. The evidence is undisputed that such conversations occurred prior to the sale although the District Court may have been of the view that they took place subsequently.
 
 
 39
 In our judgment, the question whether Biggers had knowledge of the sale on credit was a disputed issue of fact which required submission of that issue to the jury.
 
 
 40
 We are of the view that there was uncontradicted substantial evidence tending to prove conspiracy to violate the federal laws. Each of the defendants participated in it. The conspiracy did not terminate when the bonds were sold to Cage. The fraud permeated and affected the entire issue of bonds which defendants placed in the channels of trade and any purchaser had a right to rely on the prospectus and the provisions of the bonds. It was not necessary that there be privity between plaintiff and the defendants in the sale of the bonds. Cf. Hooper v. Mountain States Securities Corp., 282 F.2d 195 (CA 5). If this were not so the issuers and brokers could easily evade liability under the law because it is well known that the original purchasers of the securities do not always retain them as permanent investments and that the public trades in securities.
 
 
 41
 Defendants further claim that they acted in good faith and are innocent of any wrongdoing and that there was no evidence of any intent to defraud on their part. The intentions of the defendants are properly inferable from their acts and may be shown proven by circumstantial as well as direct evidence.
 
 
 42
 We think the evidence proves an intentional violation of the federal law by them and we are unable to attribute innocence to acts of the character which the undisputed evidence in this case shows.
 
 
 43
 Defendants further contend that the transaction between plaintiff and Cage constituted an exchange, trade or swap of plaintiff's securities for the bonds in question and that the measure of damages is the value of the securities traded. The only trouble with this contention is that plaintiff gave its check to Cage for $103,000 and Cage gave plaintiff its check for the purchase of stock and the Chapman College mortgages from plaintiff. The District Court was correct in determining as a matter of law that the checks made the transactions sales for cash.
 
 
 44
 Defendants asserted a defense of unclean hands arising out of the facts concerning the issue of plaintiff's stock. This was no defense to the claim stated in the complaint and the trial judge did not abuse his discretion in refusing to hear extraneous matters as it would have further complicated the issues in an already complicated case.
 
 
 45
 Defendants further contend that the trial judge erred in determining that the issue of bonds was illegal. This was done in another case and may not be reviewed here. Suffice it to say that the court properly charged the jury that they were not trying the validity of the bonds and should not go into that subject.
 
 
 46
 It follows from what we have said that the only issue remaining in the case is one of fact, namely, whether Biggers had knowledge that the sale of the bonds to Cage was on credit. It he did not have such knowledge, then plaintiff may recover, otherwise not. Upon remand of the case only this disputed issue of fact shall be submitted to the jury under proper instructions. Rule 59(a), Federal Rules of Civil Procedure; 6 Moore's Federal Practice, Second Edition Par. 59.06, 59.15 (3) p. 3906.
 
 
 47
 For error in granting the motion for judgment, the order of the District Court is reversed and the causes are remanded for further proceedings.
 
 
 
 [1]
 SECURITIES ACT OF 1933
 Sec. 17(a); 15 U.S.C.A. 77q
 '77(q) Fraudulent interstate transactions
 '(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly--
 '(1) to employ any device, scheme, or artifice to defraud, or
 '(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 '(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.'
 SECURITIES EXCHANGE ACT OF 1934
 Sec. 10(b); 15 U.S.C.A. 78j
 Regulation of the Use of Manipulative and Deceptive Devices.
 Section 10. 'It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--
 '(a) To effect a short sale, or to use or employ any stop-loss order in connection with the purchase or sale, of any security registered on a national securities exchange, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
 '(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.'
 SECURITIES AND EXCHANGE COMMISSION RULE X-10B-5 17 C.F.R. Par. 240.10b-5
 Rule 10b-5. Employment of Manipulative and Deceptive Devices.
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,
 (a) to employ any device, scheme, or artifice to defraud,
 (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
 
 
 [2]
 The court has this day handed down a written opinion in the companion case of Texas Continental Life Insurance Company v. Bankers Bond Company, Inc. et al., 187 F.Supp. 14, and which has been consolidated for trial with this case by an order of court
 The evidence introduced at the trial was in all material respects, with one exception, pertinent to the issues in each case. The one exception was the fact that in the testimony offered by the defendants there was evidence that Bevie F. Biggers, representing the plaintiff, was informed of the fact that the bonds in question had not been sold for cash but had been sold for part cash and for a promissory note of $1,725,000. That evidence is denied by the plaintiff but it must stand as an issue of fact to be determined by a jury.
 It is argued by the plaintiff that the fact that the note could be redeemed or credited by the return of the bonds themselves was not known and is not claimed to have been known by Bevie F. Biggers and this being a material fact and concealed is sufficient of itself to establish the liability of the defendants even though it may be admitted for the purposes of the motion that Mr. Biggers was advised of the note transaction at the time of the purchase of the bonds.
 The court is of the opinion, however, that if Mr. Biggers knew of the note, he was thereby advised of the irregularity of the bond issue and could not claim to be a bona fide purchaser without notice.
 The plaintiff's motion for judgment in accordance with the motion for a directed verdict made at the close of all the evidence should be overruled. An order to that effect is this day entered.