677 F.2d 1289
 Fed. Sec. L. Rep. P 98,720
SECURITIES AND EXCHANGE COMMISSION, Plaintiff,
v.
The SEABOARD CORPORATION, etc., et al., Defendants.
ADMIRALTY FUND, and Admiralty Fund Growth Series Litigation
Trust, Cross-Claimant/Appellant,
v.
Lewis JONES, Cross-Defendant/Appellee.
 No. 79-3818.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 8, 1981.
Decided May 24, 1982.
 
 Stephen H. Marcus, Greenberg, Bernhard, Weiss & Karma, Los Angeles, Cal., for cross-claimant/appellant.
 Brian G. Gough, MacDonald, Halsted & Laybourne, Los Angeles, Cal., for cross-defendant/appellee.
 Appeal from the United States District Court for the Central District of California.
 Before WRIGHT and WALLACE, Circuit Judges, and EAST,* Senior District Judge.
 EUGENE A. WRIGHT, Circuit Judge:
 
 
 1
 This is an appeal of a summary judgment for cross-defendant Lewis Jones. We reverse in part and remand for trial because we find material issues relating to the statute of limitations and to Jones' scienter.
 
 FACTUAL BACKGROUND
 
 2
 The transaction that provides the factual background for this appeal is Admiralty Fund's (hereinafter AF) purchase of stock of Oceanography, Inc.
 
 
 3
 In count 2 of its second amended cross-claims, AF alleged that Jones had participated in a scheme to defraud it in this purchase in violation of §§ 12(1) and 12(2) of the 1933 Securities Act (15 U.S.C. §§ 77l (1) and 77l (2) ), § 10(b) and Rule 10b-5 thereunder (15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5,) § 25401 of the California Corporations Code, and the rules of common law fraud.[1] The basic facts upon which these claims are based are not in dispute.
 
 
 4
 Jones was the attorney for Oceanography, Inc., which in 1971 had no substantial assets. The company was controlled by George Caleshu, who engaged Harry Turner and John Rawlings to find it new capital. Turner and Rawlings introduced Caleshu to Jerome Randolph, then president and director of Seaboard and the Funds. Randolph agreed to arrange the purchase of Oceanography shares by AF.[2]
 
 
 5
 To avoid registration requirements, the purchase of Oceanography shares was to occur via Information Communications Applications, Inc. (hereinafter ICA). ICA held an Oceanography convertible debenture that was in default, and it had threatened litigation.
 
 
 6
 After negotiation, ICA agreed to exchange its defaulted debenture, which was convertible into 300,000 common shares, for one convertible into 600,000. AF would then purchase 400,000 of the shares from ICA through a broker for $200,000. ICA would retain $30,000 of the $200,000 and reinvest the balance in Oceanography in exchange for two new debentures with face amounts totalling $200,000. Broker for the sale would be P. N. MacIntyre & Co.
 
 
 7
 These arrangements were made at meetings between ICA and Oceanography. Jones was in attendance.
 
 
 8
 The defaulted debenture held by ICA had been placed under an exemption to the registration requirements of the 1933 Act and bore a restrictive legend. ICA queried Oceanography management whether the legend could be removed. For this purpose, Jones' opinion was sought.
 
 
 9
 By a letter of September 30, 1971, he expressed the opinion that, because the debenture had been held for more than two years, and investment intent had thereby been demonstrated, Oceanography management could comply with ICA's request and remove the legend.
 
 
 10
 The next day, ICA presented its debenture for conversion to a new, delettered debenture, which was immediately exchanged for 600,000 shares of Oceanography common.
 
 
 11
 On October 4, 1971, a meeting was held at the offices of the broker and its counsel where final arrangements for the sale were made. In addition to Jones, representatives of Oceanography, ICA, and the broker attended. Though no AF representatives were there, the confirmation of the sale stated that MacIntyre was acting as broker for both parties. At the meeting documents were prepared to record the sale.
 
 
 12
 A letter from ICA to MacIntyre & Co. contained direction and agreement to sell the stock "as agent for (ICA) only through a private sale that is exempt pursuant to the Securities Act of 1933." Other letters were prepared to acknowledge receipt of the stock, to request transfer of the stock into street name, and to give instructions to an escrow agent for the transfer of Oceanography's new debentures in exchange for ICA's reinvestment of funds. One of the new debentures was also prepared and executed. It bore a restrictive legend.
 
 
 13
 Confirmation of the sale of the 400,000 shares to AF issued the next day. Approximately one year later, AF sold them for $1.00.
 
 
 14
 The essential allegation of its cross-claim against Jones is that he, as attorney for Oceanography, participated in a scheme to sell it worthless, restricted stock. This was contrary to Randolph's expectations, consistent with AF policy, that he was receiving nonrestricted stock in the purchase. Jones was therefore alleged to be a direct violator, a coconspirator, and an aider and abettor of federal and state securities law violations.
 
 
 15
 Jones moved for summary judgment based on these grounds relevant to this appeal: (1) he could not be held liable under §§ 12(1) or 12(2) because claims under those sections were barred by the statute of limitations; (2) alternatively, he could not be held liable under § 12 or Cal.Corp.Code § 25401 because he was not a "seller"; and (3) the § 10(b) and common law fraud claims were insufficiently pleaded because there was no allegation of scienter.
 
 
 16
 In response to the motion, AF argued generally that the whole transaction had been formulated and executed with the intent of deceiving AF into believing that it was getting freely tradeable stock. It rehearsed the benefits derived from the transaction by all but AF. Oceanography was able to issue 600,000 shares of unregistered stock. ICA was able to exchange a $100,000 defaulted debenture for one with twice the face value and $30,000 of ready cash. MacIntyre received $12,000 for very little work, and Jones could now assess his attorney's fees from the new cash received by Oceanography.
 
 
 17
 AF also reviewed Jones' attendance at the various meetings that preceded the sale. According to AF's version of discovered evidence, Jones participated in the negotiation of the Oceanography-ICA arrangement, which was meant to avoid an ICA suit for default.
 
 
 18
 In his role as sole attorney for Oceanography, Jones communicated with Caleshu daily. His letter approving removal of the restrictive legend on ICA's defaulted Oceanography debenture was written with knowledge that ICA meant to convert the debenture to stock for immediate resale to AF.
 
 
 19
 His "deep" involvement in all meetings precedent to the sale suggest his awareness of the fraud that was to be perpetrated on AF. The consensus at these meetings was that the AF stock was probably restricted, but the decision was made that the stock would not bear a restrictive legend.
 
 
 20
 AF also countered Jones' statute of limitations defense, as well as his argument that he could not be liable under § 12(2) and Cal.Corp.Code § 25401 because he was not a seller, which arguments are renewed before us on appeal.
 
 
 21
 The district court granted summary judgment for Jones. Its general finding, announced from the bench, was that there was no evidence that Jones had participated in, or aided and abetted, a securities law violation. Specifically, it made these "findings of fact":
 
 
 22
 (1) From March 1970 until June 1972 Randolph was responsible for the investment decisions of AF;
 
 
 23
 (2) Jones committed no acts in furtherance of any alleged securities law violation;
 
 
 24
 (3) He had no knowledge of and did not assist in any securities law violation;
 
 
 25
 (4) He did not intend, nurture, condone, sanction or otherwise induce any of the acts upon which AF asserts liability; and
 
 
 26
 (5) He did not participate in any scheme or conspiracy to defraud or deceive AF in it's purchase of Oceanography stock.
 
 DISCUSSION
 
 27
 Summary judgment is proper only when (1) the pleadings, depositions, affidavits and other material permitted by Rule 56(c) show that there is no disputed issue of material fact, and (2) on the agreed facts, the moving party is entitled to prevail as a matter of law. Fed.R.Civ.P. 56(c); Pegasus Fund, Inc. v. Laraneta, 617 F.2d 1335, 1339 (9th Cir. 1980). A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing version of the truth. United States v. First National Bank of Circle, 652 F.2d 882, 887 (9th Cir. 1981).
 
 
 28
 Well known principles controlling summary judgments apply here. See Adickes v. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).
 
 I. Securities Act Violations
 A. Section 12(1)
 
 29
 AF conceded at argument that its § 12(1) claim is barred by the one-year statute of limitations of § 13 of the Securities Act, 15 U.S.C. § 77m. We consider the claim no further and affirm judgment.
 
 B. Section 12(2)
 
 30
 Jones contends that he is not liable under § 12(2) because: (1) the action is barred by the statute of limitations; and (2) he was not a seller.
 
 
 31
 1. Statute of Limitations Defense. A statute of limitations defense is properly asserted in a motion for summary judgment to show that the defendant is entitled to judgment as a matter of law. The motion will be granted if the action is clearly barred. But if the running or tolling of the statute requires the adjudication of facts issues, the motion will be denied. C. Wright & A. Miller, Federal Practice and Procedure § 2734 at 647-48 (1973).
 
 
 32
 Section 13 of the Securities Act provides that an action must be brought within one year from discovery of the untrue statement or omission, or "after such discovery should have been made by the exercise of reasonable diligence."
 
 
 33
 In support of the motion, Jones asserted that several events put AF on notice of the fraud:
 
 
 34
 (1) A second purchase of Oceanography stock from a company called Servicios Mundiales, S.A. was proposed about a month after the ICA purchase. The transaction was cancelled after Alan Markizon, counsel to AF, received a request for a hold harmless letter from broker Cantor Fitzgerald & Co. In a letter to Cantor, dated November 16, 1971, Markizon said he was "not satisfied that all the requirements of the federal securities laws (had) been met by the sellers."
 
 
 35
 (2) A third purchase of Oceanography stock from a broker, Birkenmeyer & Co., was proposed in December 1971. Markizon discussed with Birkenmeyer whether the stock was restricted and concluded that AF should not buy because he did not trust the legal opinions that had been already rendered on the question.
 
 
 36
 (3) Markizon sent a newspaper clipping to AF outside counsel, which stated that a certain broker-dealer had been enjoined from trading in several securities, including those of Oceanography.
 
 
 37
 (4) On December 6, 1972, AF sold its Oceanography holdings at nearly a total loss.
 
 
 38
 AF responded to these factual assertions with an affidavit from Alan Markizon. He swore that Randolph made all investment decisions for AF until his departure in June 1972. Not until February or March of 1973 did he (Markizon) first become aware of improprieties in relation to AF's portfolio stocks. He said that the Cantor transaction was cancelled because he was unwilling to give the hold harmless letter. There was no discussion of the affairs or securities of Oceanography. The Birkenmeyer transaction was cancelled because he believed AF's position in Oceanography was sufficient. He explained the newspaper clipping sent to AF as unrelated to AF's Oceanography holdings.
 
 
 39
 We have held that the question when fraud is discovered is for the trier of fact. Briskin v. Ernst & Ernst, 589 F.2d 1363 (9th Cir. 1978); Hilton v. Mumaw, 522 F.2d 588 (9th Cir. 1975). Cf. Ohio v. Peterson, 651 F.2d 687 (10th Cir. 1981) (because tolling is equitable doctrine, judge may decide).
 
 
 40
 Because our precedent dictates that the question of notice of fraud is for the trier of fact, the party seeking summary disposition has an extremely difficult burden to show that there exists no issue of material fact regarding notice. With this in mind, viewing Jones' submissions in a light most favorable to AF, and assuming AF's submissions to be true, we find that Jones has not clearly shown that Markizon or others at AF were put on notice of the alleged misrepresentation that the Oceanography shares were unrestricted.
 
 
 41
 Markizon's letter to Cantor may be read as applying only to the purchase from Servicios Mundiales. Refusal of the Birkenmeyer purchase may be explained by the investment decision that AF held a sufficient amount of Oceanography. The newspaper clipping does appear unrelated, and the decline in the stock's value may be explained by mismanagement, economic decline, etc. See Briskin v. Ernst & Ernst, 589 F.2d at 1368.
 
 
 42
 Though it is our prerogative to affirm summary judgment on grounds other than those used by the trial court, we decline to do so here. We turn to Jones' assertion that he cannot be liable under § 12(2) because he was not a "seller."
 
 
 43
 2. Section 12(2) Sellers. The meaning of "seller" for purposes of § 12 has been judicially expanded beyond the person who transfers title to include "participants" in the transaction. The test is whether the injury to the plaintiff flowed directly and proximately from the actions of the defendant.[3] SEC v. Murphy, 626 F.2d 633, 650 (9th Cir. 1980); Pharo v. Smith, 621 F.2d 656, rehrg. granted, 625 F.2d 1226 (5th Cir. 1980); Hill York Corp. v. American International Franchises, Inc., 448 F.2d 680, 692-93 (5th Cir. 1970).
 
 
 44
 AF argues that Jones' position as an "agent" of Oceanography was sufficient to make him directly liable as a "seller." In this position he planned and effectuated the transaction. In the alternative, AF argues that Jones is at least liable under the section as a coconspirator or as an aider and abettor of primary violators. Because we believe there exists an issue of material fact regarding the extent of Jones' participation in the transaction, we do not consider the latter theories of liability.[4]
 
 
 45
 We do not believe that on this record the district court could rule as a matter of law that Jones was not a "seller" within the meaning of § 12(2). The extent of his relationship with Oceanography is not clear.
 
 
 46
 There is disagreement about his participation in negotiations between Oceanography and ICA concerning the defaulted debenture as well as about the degree and purpose of his participation in the final arrangements for the sale of the ICA shares to MacIntyre. Nor is it clear what role Jones played in the decision that the stock issued to ICA should not bear a restrictive legend.
 
 
 47
 Material issues of fact remain regarding the extent of his participation in the transaction as a whole. We reverse summary judgment on the § 12(2) claim and remand for hearing of the evidence.
 
 II. Exchange Act Violations
 
 48
 AF asserts that Jones is liable for violation of § 10(b) of the Exchange Act and Rule 10b-5 thereunder. On appeal of the summary judgment for Jones, AF argues that there is a material issue of fact regarding Jones' scienter for purposes of direct, coconspirator, or aider and abettor liability under the section and rule. We agree.
 
 
 49
 We have set out the provisions of § 10(b) and Rule 10b-5 in our discussion of the Ernst & Ernst part of this litigation. See Admiralty Fund v. Hugh Johnson & Co., No. 79-3820, --- F.2d at ---- (9th Cir., May 24, 1982). There we discussed the scienter requirement of Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), and the possible existence of secondary liability under the section and rule. See Admiralty Fund, supra, --- F.2d at ---- n.12.
 
 
 50
 We have said that when intent is at issue, the court should be cautious in granting summary judgment. Vaughn v. Teledyne, Inc., 628 F.2d 1214, 1220 (9th Cir. 1980). In such a case, the moving party bears a heavier burden of showing that there exists no genuine issue of material fact.
 
 
 51
 Here Jones offered neither affidavits or other proof that he did not know of the alleged fraud. He argued only that scienter had been inadequately pleaded. This was insufficient to meet his burden.[5] Although his motion relied generally upon pleadings, depositions, and other documents on file, he failed to argue that these established as a matter of law that he lacked scienter sufficient for some violation of the securities laws.
 
 
 52
 The evidence does not show that AF could not prove a violation of the securities laws. It does show that Jones actively participated in at least some aspects of the Oceanography transaction, which may have defrauded AF.
 
 
 53
 If Jones knew of the misrepresentation that the stock was unrestricted and actively took part in it, he may be liable as a direct violator of the section and rule. Ernst & Ernst v. Hochfelder, supra. He may also be liable if his participation in the misrepresentation was reckless. Nelson v. Serwold, 576 F.2d 1332 (9th Cir.), cert. denied, 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978).
 
 
 54
 He may be liable as an aider and abettor if he knew that those for whom he worked were committing a fraud and he substantially aided the overall enterprise. See Woodward v. Metro Bank of Dallas, 522 F.2d 84 (5th Cir. 1975); Brennan v. Midwestern United Life Insurance Co., 259 F.Supp. 673 (N.D.Ind.1966).
 
 
 55
 If, as Jones argues, scienter was inadequately pleaded, AF should have been allowed to amend. The cross-claim as pleaded would not have precluded AF from making more specific allegations of scienter. See Bonanno v. Thomas, 309 F.2d 320 (9th Cir. 1962). Without deciding whether the cross-claim stated a cause of action under § 10(b), we find that summary judgment was improper because Jones failed to meet his burden of proof.[6]
 
 III. The Pendent State Claims
 A. Cal.Corp.Code §§ 25401, 25501
 
 56
 At the time of the sale, Cal.Corp.Code § 25501 provided:
 
 
 57
 Any person who violates Section 25401 shall be liable to the person who purchases a security from him or sells a security to him ....
 
 
 58
 Hence, liability was limited to actual sellers.[7] Jones was not the literal seller, as required by this section. We affirm the judgment as to this claim.
 
 B. Common Law Fraud
 
 59
 The common law fraud claim is based on the same facts as the § 10(b) claim. Applying the same analysis here, we reverse summary judgment on the pendent common law fraud claim and remand it for hearing with the § 10(b) claim.
 
 
 60
 The judgment is reversed and the cause remanded as to the § 12(2), § 10(b), and common law fraud claims. Judgment relating to all other claims is affirmed.
 
 
 
 *
 Of the District of Oregon
 
 
 [1]
 Claims based on § 17(a) of the 1933 Act, §§ 15(b)(4) and 15(b)(4)(E) of the 1934 Act, § 206 of the Investment Advisers Act, and §§ 25402, 25110 and 25130 of the California Corporations Code were also alleged, but these have since been dismissed or abandoned
 
 
 [2]
 The SEC complaint alleged that Randolph received kickbacks for this arrangement
 
 
 [3]
 Note that the broad reading of "seller" may be in some doubt in light of recent Supreme Court cases that prescribe a strict statutory construction approach to the securities acts and reject their expansion with tort and criminal theories. See Admiralty Fund v. Hugh Johnson & Co., No. 79-3820, --- F.2d ---- at ---- n.12 (9th Cir., May 24, 1982)
 
 
 [4]
 Though some courts have implied coconspirator liability in the terms of § 10(b) and Rule 10b-5, see, e.g., Dasho v. Susquehanna Corp., 380 F.2d 262 (7th Cir.), cert. denied, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 470 (1967); Texas Continental Life Ins. Co. v. Dunne, 307 F.2d 242 (6th Cir. 1962); Kardon v. National Gypsum Co., 69 F.Supp. 512 (E.D.Pa. 1946), it has not been implied in § 12(2). The section has been read expansively, however, to impose liability on aiders and abettors. See, e.g., In re Caesar's Palace Securities Litigation, 360 F.Supp. 366 (S.D.N.Y.) (1973)
 We note little difference between the scope of liability under an aider and abettor theory and that under the participant theory relied upon in SEC v. Murphy, 626 F.2d 633 (9th Cir. 1980). We note the doubtful nature of both in light of recent Supreme Court cases that prescribe a strict statutory construction approach to the securities acts and reject their expansion with tort and criminal theories. See Admiralty Fund v. Hugh Johnson & Co., No. 79-3820, slip op. at 2217 n.12, --- F.2d at ---- n.12 (9th Cir., May 24, 1982).
 We note also that the district courts have read the section strictly. See, e.g., In re Gap Stores Securities Litigation, 457 F.Supp. 1135 (N.D.Cal.1978); In re Equity Funding Corporation of America Securities Litigation, 416 F.Supp. 161 (C.D.Cal.1976).
 
 
 [5]
 The general denials in Jones' answer are insufficient to support summary judgment. Goldwater v. Ginzburg, 414 F.2d 324, 337 (2d Cir. 1969), cert. denied, 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970). We note also that this is not a case in which there is no basis for allegations that Jones knew of the fraud. He participated in various steps of the sale of the stock to AF, and he knew of Oceanography's poor financial condition
 
 
 [6]
 Jones' arguments on appeal miss the point. He argues that the investment legend was properly removed from the debenture, that he made no representations to AF that the stock was unrestricted, and that AF's agent, MacIntyre, knew the stock was restricted. This attempts to draw his potential liability too narrowly, at least at this stage of the development of the record
 It is clear that there is a genuine issue of fact whether there was a scheme to defraud AF. Jones has offered no direct evidence that he was unaware of the fraud, or that he was not a participant in the alleged scheme. We cannot say as a matter of law that he did not participate in a way that would render him liable.
 Nor does MacIntyre's alleged involvement shield Jones from liability. Although MacIntyre was acting as AF's agent, it was alleged that he was a participant in the scheme. His knowledge may not be imputed to AF if he participated in the scheme and concealed the fraud from AF.
 
 
 [7]
 Section 25504.1, added by the statutes of 1977, provides for liability of any person who materially assists in a violation of Section 25401. Because this section was not in force at the time of the sale, it cannot subject Jones to liability here