Damon BELLANGER, Plaintiff,

v.

HEALTH PLAN OF NEVADA, INC., a Nevada corporation, sometimes doing business as Health Plan of Nevada, and Does I through X, inclusive, Defendants.

No. CV–S–92–020–PMP(LRL).

United States District Court,
D. Nevada.

March 9, 1993.

James J. Lee, John Peter Lee, Las Vegas, NV, for plaintiff.

Lynn M. Hansen, Jimmerson, Davis & Santoro, Las Vegas, NV, for defendants.

## ORDER

PRO, District Judge.

Pending before the Court is Plaintiff Damon Bellanger's ("Bellanger") Motion for Summary Judgment (# 47). Defendant Health Plan of Nevada ("Health Plan") filed an Amended Opposition (# 52) on September 15, 1992, and Bellanger filed his Reply (# 55) on October 14, 1992. Defendant filed a Motion to Strike Plaintiff's Reply (# 56) on October 16, 1992. This Court conducted a hearing regarding Bellanger's motions on December 18, 1992.[1]

---

1. On December 23, 1992, this Court entered an Order granting Summary Judgment (# 61). However, on Motion of Defendant Health Plan (# 68), this Court on March 8, 1993, vacated its earlier Order granting Summary Judgment (# 61) and hereby substitutes this Order in its place.

## FACTS

Plaintiff Bellanger injured his right arm and shoulder in a motorcycle accident in May 1989. As a result of the accident, Bellanger suffered total paralysis of his right arm. Bellanger is a beneficiary of an ERISA health plan administered by Defendant Health Plan. Both parties agree that Health Plan is an employee benefit plan, as well as the administrator of the plan, as those terms are defined in ERISA. Bellanger sought care for his injury from Dr. Jenike, a board certified neurologist, and a doctor in Health Plan's system.

After examining and testing Bellanger, Dr. Jenike determined that there was nothing that could be done medically for Bellanger's paralysis. Nevertheless, Bellanger sought another opinion from Dr. John Romine, a neurologist with the Scripps Clinic in La Jolla, California, who was not part of Health Plan. Dr. Romine felt that Bellanger would be a good candidate for a highly specialized form of neurosurgery, and referred Bellanger to a doctor in San Diego who specializes in that type of surgery, Dr. Richard Ostrup. Dr. Ostrup confirmed Dr. Romine's opinion that Bellanger might very well benefit from this specialized surgery.

After meeting with Dr. Ostrup, Bellanger again consulted with Dr. Jenike. Dr. Jenike repeated the tests he had performed on Bellanger during his first visit. Bellanger told Dr. Jenike about his examination with Dr. Ostrup, and informed him that Dr. Ostrup felt Bellanger might benefit from the specialized surgery. At Bellanger's request, Dr. Jenike sent a request to Health Plan for authorization of a referral. This was a request for services outside the Plan which required authorization from Health Plan prior to the services being performed. Had authorization been granted, Bellanger would then have been allowed to go to a doctor outside of Health Plan's normal coverage, and Health Plan would have then paid for the services rendered.

Dr. Jenike's request for a referral was sent to Health Plan's medical supervisor, Dr. Charles Signorino. Dr. Signorino denied the request, and sent Bellanger a written notice of the denial. Dr. Signorino also communicated this denial to Dr. Jenike, and informed Dr. Jenike that before the authorization would be granted, Bellanger would have to be examined by a Plan neurosurgeon. The Notice of Denial sent to Bellanger stated that the request was denied because it was a request for "out of area services," and it noted that Bellanger had the right to request reconsideration of this decision by notifying Health Plan within 30 days. The Notice also stated that if Bellanger chose to request reconsideration and disagreed with that decision, he could file a grievance through the Health Plan Member Services Department. Bellanger appealed the denial to the Grievance Committee, which also denied his claim. The Committee informed Bellanger of its decision by letter. The letter stated that he had a right to appeal its decision to Health Plan's Board of Directors. Bellanger chose to appeal to the Board of Directors, and the Board upheld the decision of the Grievance Committee.

On January 29, 1991, Dr. Ostrup performed the specialized surgery. Bellanger states that as a result he has regained some ability to contract his right biceps, has experienced a reduction in pain, and has the potential to regain partial function in his right arm.

Bellanger alleges that Health Plan violated 29 U.S.C. § 1133, and 29 C.F.R. § 2560.503–1, because it failed to provide Bellanger with a written notice that (1) contained specific reasons for denial, (2) cited pertinent plan provisions, and (3) informed him of what he needed to do to perfect his claim. He claims that the specific reason that his request was denied was because he did not get a second opinion, as required by Health Plan, but that neither Health Plan nor the notice of denial informed him of a requirement to obtain such a second opinion.

Before filing his original complaint in this Court on January 9, 1992, Bellanger filed an action in the Eighth Judicial District Court in Nevada on February 13, 1991. He sought relief in that court based on state law theories of breach of contract and unfair claims practices. The Nevada district court granted summary judgment for Defendant Health Plan, on the ground that Plaintiff's case was preempted by the federal Employee Retirement Income Security Act of 1974 (ERISA). Plaintiff then filed this action seeking relief under ERISA, citing specifically 29 U.S.C. § 1132(a), (e), and (f) (§ 502(a), (e), and (f) of ERISA).

On April 16, 1992, this Court granted Defendant's Motion to Dismiss Plaintiff's claim for breach of fiduciary duty (# 24), and struck Plaintiff's jury demand (# 23).

## ANALYSIS

### I. Motion To Strike

■ Defendant moves this Court to strike Plaintiff's Reply in support of Plaintiff's Motion for Summary Judgment. Although the date on which the Reply was due, October 12, 1992, was a Federal holiday, under Fed.R.Civ.Pro. 6(a), the Reply should have been filed on Tuesday, October 13, 1992. In fact, it was not filed until the following day. This Court expects the parties to comply with the deadlines that are set, and will not hesitate to strictly enforce them. This is especially true in the present situation, where Plaintiff had stipulated to the filing date. Therefore, Defendant's Motion to Strike Plaintiff's Reply (# 56) is granted.

### II. Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The party moving for summary judgment has the initial burden of showing the absence of a genuine issue of material fact. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Zoslaw v. MCA Distrib. Corp.,* 693 F.2d 870, 883 (9th Cir.1982). Once the movant's burden is met by presenting evidence which, if uncontro-

verted, would entitle the movant to a directed verdict at trial, the burden then shifts to the respondent to set forth specific facts demonstrating that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). If the factual context makes the respondent's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *California Arch. Bldg. Prod. v. Franciscan Ceramics,* 818 F.2d 1466, 1468 (9th Cir.1987), *cert. denied,* 484 U.S. 1006, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988).

If the party seeking summary judgment meets this burden, then summary judgment will be granted unless there is significant probative evidence tending to support the opponent's legal theory. *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968); *Commodity Futures Trading Comm'n v. Savage,* 611 F.2d 270 (9th Cir. 1979). Parties seeking to defeat summary judgment cannot stand on their pleadings once the movant has submitted affidavits or other similar materials. Affidavits that do not affirmatively demonstrate personal knowledge are insufficient. *British Airways Bd. v. Boeing Co.,* 585 F.2d 946, 952 (9th Cir.1978), *cert. denied,* 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). Likewise, "legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment." *Id.*

A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth. *See Admiralty Fund v. Hugh Johnson & Co.,* 677 F.2d 1301, 1305–06 (9th Cir. 1982); *Admiralty Fund v. Jones,* 677 F.2d 1289, 1293 (9th Cir.1982).

All facts and inferences drawn must be viewed in the light most favorable to the responding party when determining whether a genuine issue of material fact exists for summary judgment purposes. *Poller v. CBS, Inc.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). After drawing inferences favorable to the respondent, summary judgment will be granted only if all reasonable inferences defeat the respondent's claims. *Admiralty Fund v. Tabor,* 677 F.2d 1297, 1298 (9th Cir.1982).

The trilogy of Supreme Court cases cited above establishes that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.,* 477 U.S. at 327, 106 S.Ct. at 2555 (quoting Fed.R.Civ.P. 1). *See also Avia Group Int'l, Inc. v. L.A. Gear Cal.,* 853 F.2d 1557, 1560 (Fed.Cir.1988).

■ Bellanger contends that Health Plan's Notice of Denial of Dr. Jenike's request for referral violated 29 U.S.C. § 1133, and 29 C.F.R. § 2560.503–1(f), which require a health plan to give certain information when denying a claim for benefits. Section 1133 states:

in accordance with regulations of the Secretary, every employee benefit plan shall—

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 C.F.R. § 2560.503–1(f) states:

A plan administrator ... shall provide to every claimant who is denied a claim for benefits written notice setting forth in a manner calculated to be understood by the claimant:

(1) The specific reason or reasons for the denial;

(2) Specific reference to pertinent plan provisions on which the denial is based;

(3) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and

(4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review.

Bellanger argues that the Notice of Denial that Health Plan sent to him was deficient under the statute and regulation because the Notice did not state the reason for denying the request. Although the Notice stated that the claim was denied because it requested "out of area services," Bellanger contends that the real reason for denial was because Health Plan required a second opinion to be obtained before it would approve the out-of-plan neurosurgery. Bellanger cites an internal Health Plan document which requires a second opinion when an insured requests neurosurgery. Finally, Bellanger argues that Health Plan failed to inform him that a second opinion was required, and because of this, this Court should apply principles of equitable estoppel to prevent Health Plan from denying Bellanger's claim.

Health Plan argues that there are a number of genuine factual disputes material to this litigation that prevent this Court from granting summary judgment in Bellanger's favor. First, Health Plan argues that, contrary to Bellanger's assertion, it did not deny the referral request for lack of a second opinion. Rather, it claims it denied the request because it was an uncovered, out-of-plan service, and that it requested Dr. Jenike to get a Board Certified Neurosurgeon's opinion as to whether the referral was for medically necessary services that no doctor within the Health Plan system could perform. Second, Health Plan contends that

Bellanger had "actual knowledge" of the requirement that he be examined by a doctor in the Health Plan system as a precondition to receiving authorization for the requested referral, as Dr. Jenike, the member handbook, and the Certificate of Coverage all informed him of this fact. Third, Health Plan maintains that it fully complied with the requirements of § 1133 and 29 C.F.R. § 2560.503–1. Health Plan cites 29 C.F.R. § 2560.503–1(j), which states that the claims procedures of a qualified health maintenance organization are deemed to satisfy §§ 1133 and 2560.503 if the procedures meet the requirements of § 1301 of the Public Health Services Act (codified at 42 U.S.C. § 300e) and the regulations thereunder. Health Plan asserts that the Health Care Financing Administration, the agency that administers the Act, reviews Health Plan's procedures and forms every two years, and that because Health Plan is a federally qualified health maintenance organization, subsection (j) grants it a presumption that its claims procedures fulfill the requirements of §§ 1133 and 2560.503. Finally, Health Plan argues that the evidence taken in a light most favorable to it shows an issue of fact as to whether Bellanger knew he had to go see a neurosurgeon within the Plan before Jenike's referral request would be approved.

■ Even taking the evidence in a light most favorable to Health Plan, this Court finds that the facts as stated do not raise a question of fact as to whether Bellanger had "actual knowledge" that he had to see a Plan neurosurgeon before Health Plan would approve his treatment at Scripps. Health Plan points to three facts to support its "actual knowledge" argument: first, that Dr. Jenike advised Bellanger to make an appointment with Dr. Capanna, a Plan neurosurgeon[2];

2. Jenike's deposition indicates that his secretary telephoned Bellanger and told him that his referral request had been denied. Jenike's deposition further reveals that his secretary informed Bellanger that Dr. Capanna does the procedure in question in Las Vegas, and asked if Bellanger was interested in seeing Capanna.

Furthermore, Health Plan points to Bellanger's statements in front of the Grievance Committee as evidence of his "actual knowledge." In response to the question of whether Dr. Jenike ever

talked to him about seeing Dr. Capanna, Bellanger replied, "yes, but from the way Dr. Jenike described how the surgery would be performed through the spine [by Dr. Capanna], it sounded too risky, and I decided seeing Dr. Capanna would do no good." Contrary to Health Plan's assertions, this statement does not evidence knowledge on the part of Bellanger that he had to consult with Dr. Capanna before Health Plan would authorize a referral. Rather, it seems to indicate that Bellanger was under the impression

second, that in a letter sent by Bellanger to Health Plan, Bellanger stated that "Jenike recommended that I see another local doctor"; and third, that at the time Bellanger requested approval of the referral, he had already made an appointment to go to Scripps. None of these facts, taken together as true, indicate that Bellanger actually knew that the reason Health Plan denied his referral to Scripps was because he had requested out-of-plan services, and as such, was required to see a Plan neurosurgeon first, in order to determine whether the services were medically necessary and if they were available locally.

■ Health Plan, however, argues that it meets the requirements set forth in 42 U.S.C. § 300e (Public Health Services Act), and as such, 29 C.F.R. § 2560.503–1(j) deems Health Plan's claims procedures to be satisfactory. It contends that its forms are reviewed periodically and approved by the Health Care Financing Administration. Health Plan argues that the claims procedures of a health maintenance organization, merely by virtue of the fact that it is a federally qualified organization, are deemed sufficient under 29 C.F.R. § 2560.503–1(j). However, the language of subsection (j) indicates otherwise.

Subsection (j) grants a qualified HMO the presumption that its claims' procedures satisfy statutory requirements only if those procedures meet the requirements found in 42 U.S.C. § 300e and the regulations thereunder. The regulations promulgated under § 300e are found at § 417.107(g)(1) and (2). This section, labelled "grievance procedures," states:

Each HMO shall have and use meaningful procedures for hearing and resolving grievances between the HMO (including the staff of the HMO, the medical group, and IPA) and the members of the HMO. These procedures must assure that:

(1) ..., and (2) appropriate action will be taken promptly, including a full investigation if necessary and notification of concerned parties as to the results of the HMO's investigation.

Health Plan asserts that it has complied with the requirements of this regulation. In its Opposition to Plaintiff's Motion for Summary Judgment, Health Plan submits an affidavit from Larry Howard, Vice–President and Chief Operating Officer of Health Plan. Mr. Howard states that the Health Care Financing Administration ("HCFA") reviews Health Plan's claims procedures every 24 months, and has found Health Plan to be in compliance with the appropriate federal regulations. According to Mr. Howard, this includes approving Health Plan's forms and procedures used to notify a member of a denial of a referral.

In ruling on this Motion, this Court does not hold that Health Plan's forms or general procedures for notifying a member that a referral has been denied are inadequate. The method in which these forms and procedures were used in Bellanger's case, however, was inadequate.

HCFA may have approved of the type of form sent to Bellanger on January 12, 1990. The information provided to Bellanger on that form, however, did not serve to put him on notice that he would have to seek consultation with a Plan neurosurgeon.[3] Health Plan calls this Court's attention to the notice printed at the bottom of every page of the "Group Certificate of Coverage." This notice states that prior authorization is required for certain referral services. This Court is also aware of the allegation that Dr. Jenike's office informed Bellanger that Health Plan had denied his referral and that Jenike wanted to know if Bellanger was interested in seeing Dr. Capanna.

Despite these facts, Bellanger could not know that he was *required* to see Dr. Capanna or another similar physician within the

that the only reason he was being sent to see Capanna was so that Capanna could do the surgery. This statement does not indicate that Bellanger was aware that instead of performing the surgery himself, Capanna might authorize the referral to Scripps, or that seeing Capanna was a prerequisite to obtaining the referral.

3. The form was marked in such a way as to indicate that the reason for the denial of the referral was because the requested referral was for "out of area services."

Plan before his request for referral would be granted. The Certificate put him on notice that prior authorization may be required before Health Plan would pay for the services provided by Scripps. The letter of denial told him the referral was denied because it was for out-of-plan services, and that if he disagreed, he had the right to request reconsideration, which he did. Dr. Jenike asked him if he wanted to see Dr. Capanna.[4] There is no evidence, however, that suggests that Bellanger was ever informed that seeing Capanna was a prerequisite to getting his referral request approved. For all Bellanger knew, Jenike was merely suggesting Capanna as another doctor who might be able to better treat Bellanger's injury. Bellanger, however, had already found a doctor he wanted to treat the injury, and based on the information provided to him, had no basis for believing that a visit with Dr. Capanna would improve his medical condition, or his chances of being reimbursed for treatment provided by Scripps.

 Health Plan argues that Bellanger planned to go to Scripps whether or not the Grievance Committee passed favorably upon his request for reconsideration. The facts show that Health Plan sent Bellanger the notification of denial on January 12, 1990, that Bellanger wrote to have the Grievance Committee reconsider his request on January 24, 1990, that Bellanger made an appointment with Scripps sometime in January to have the surgery performed, and that Scripps performed the surgery on January 29, 1990. Had the original notice of denial specified that Bellanger would have to go see a Plan neurosurgeon in order for that neurosurgeon to make a determination of medical necessity and local availability, there is no

indication that Bellanger would not have complied.

■ ERISA and the accompanying regulations require clear notice to a member of the steps the member must take in order to comply with Plan requirements and to have the Plan reimburse the member for desired medical services.

Although "procedural defects do not necessarily require substantive remedies", *Blau v. Del Monte Corp.*, 748 F.2d 1348, 1353 (9th Cir.1984), *cert. denied*, 474 U.S. 865, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985), a substantive remedy is appropriate where the procedural defect worked a substantive harm. *See Ellenburg v. Brockway, Inc.*, 763 F.2d 1091, 1096 (9th Cir.1985) (concluding that remanding the case back to the plan fiduciary where that fiduciary failed to follow procedural steps would be a useless formality). This Court finds that Health Plan's failure to specify the reason for denying Bellanger's claim resulted in his inability to pursue medical treatment that would have been covered by Health Plan.

IT IS THEREFORE ORDERED THAT Defendant's Motion to Strike (# 56) Plaintiff's Reply in Support of Plaintiff's Motion for Summary Judgment is granted.

IT IS ALSO ORDERED THAT Plaintiff's Motion for Summary Judgment (# 47) is granted. Defendant is ordered to reimburse Plaintiff for the medical expenses incurred as a result of Defendant's defective notice.

---

4. Health Plan argues that its procedure in which the referring physician, in this case Dr. Jenike, informs the patient that a referral is needed protects the doctor-patient relationship. It contends that if Health Plan notified a member that, for example, a test requested by the treating physician was denied because it was unnecessary, this would undermine the patient's confidence in this treating physician. This Court expresses no opinion on this question. This argument when applied to Bellanger's case, however, is a bit disingenuous, because Health Plan did in

fact send a notification of denial directly to Bellanger. Thus, it is apparent that it did not rely solely on Dr. Jenike to convey the denial of the requested referral to Bellanger.

Also, although this Court agrees with Health Plan that a provider of benefits should not interfere with medical diagnoses or referrals that a patient might need, it fails to understand how advising its members that a consultation with a Plan doctor is required before it will approve a referral constitutes an interference with the physician-patient relationship.