677 F.2d 1297
 Fed. Sec. L. Rep. P 98,721
SECURITIES AND EXCHANGE COMMISSION, Plaintiff,
v.
The SEABOARD CORPORATION, etc., et al., Defendants.
ADMIRALTY FUND; Admiralty Fund Growth Series Litigation
Trust and The Admiralty Fund Insurance Series
Litigation Trust, Cross-Claimants/Appellants,
v.
Alton TABOR, Cross-Defendant/Appellee.
 No. 79-3819.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 8, 1981.
Decided May 24, 1982.
 
 Stephen H. Marcus, Greenberg, Bernhard, Weiss & Karma, Los Angeles, Cal., for cross-claimants/appellants.
 Grace M. Mitsuhata, Loo, Merideth & McMillan, Los Angeles, Cal., for cross-defendant/appellee.
 Appeal from the United States District Court for the Central District of California.
 Before WRIGHT and WALLACE, Circuit Judges, and EAST,* Senior District Judge.
 EUGENE A. WRIGHT, Circuit Judge:
 
 
 1
 On this appeal from summary judgment for cross-defendant Alton Tabor, we reverse because we find a material issue of fact regarding Tabor's scienter.
 
 FACTUAL BACKGROUND
 
 2
 In count five of its second amended cross-claim, Admiralty Fund and Seaboard Leverage Fund (hereinafter "Funds") alleged that Tabor and others engaged in a scheme to defraud the Funds.
 
 
 3
 The basic facts are undisputed. In 1971, the president of the Funds, Jerome Randolph, met John Gordy, president and controlling shareholder of Visual Sounds, Inc. (hereinafter VSI), a small, closely held corporation engaged in the audio-visual business. Gordy wished to make a public offering of VSI stock and Randolph agreed to help through his connection with the Funds.
 
 
 4
 In 1972, VSI made a Regulation A offering of 100,000 shares at $5 each. The Funds immediately bought 4,300 shares.
 
 
 5
 Tabor first heard of the offering at the home of Patrick MacIntyre, the controlling shareholder of broker-dealer P. N. MacIntyre & Co. and Tabor's business associate. Randolph and Gordy discussed the offering and Tabor was encouraged to buy. When the offering was made, Randolph telephoned to encourage the purchase again.
 
 
 6
 Randolph proposed that, if Tabor would buy 7,500 shares, Randolph would guarantee against loss and he and Tabor would split profits from eventual sale. Tabor would take the profit on 2,500 of the shares and Randolph, the rest. Tabor borrowed $37,500 from MacIntyre and bought the stock.
 
 
 7
 Randolph made similar deals with John Rawlings and Harry Turner. They gave Randolph power of attorney to sell their stock at will and they too would split their profits with him.
 
 
 8
 Before and during the offering, Randolph and Turner induced at least three broker-dealers to create an aftermarket for the securities. Within two months of the offering, Randolph exercised his power of attorney to sell at a substantial profit part of the stock bought in Turner's name. Shortly thereafter, Tabor's stock was sold at a profit. The buyers on these and other occasions were the Funds.
 
 
 9
 The Funds eventually owned nearly 40% of the securities floated in the offering. They complained that they were locked into this "investment" because the VSI stock was "illiquid." Within 11 months after the offering, the Funds sold their VSI stock for $1 per share, a loss of about $440,000.
 
 
 10
 Tabor moved for summary judgment based upon the Funds' inability to show scienter necessary to make out a cause of action. In his affidavit supporting the motion, he swore that he had no knowledge that Randolph was employed by the Funds or engaged in the manipulation of the price of VSI stock in the secondary market. Had he known that Randolph's actions were illegal, he would not have bought the stock.
 
 
 11
 In response to the motion, the Funds presented a memorandum that reviewed the arrangement between him and Randolph and that asserted additional facts, supported by citations to depositions, to suggest the presence of scienter.
 
 
 12
 The district court found that Tabor had no knowledge that Randolph was involved in a conspiracy to manipulate the price of the VSI stock or to defraud the Funds and that Tabor did not buy with knowledge of any scheme or with any intent to deceive, manipulate, or defraud. From these findings, the court concluded that there were no genuine issues of fact about scienter and that Tabor was entitled to dismissal.
 
 DISCUSSION
 
 13
 Appellants describe the primary issue of this appeal as whether there is a genuine issue in this record regarding Tabor's scienter.
 
 
 14
 Randolph apparently admitted the facts underlying the VSI transaction and judgment was entered against him for violation of § 12(2) of the Securities Act (15 U.S.C. 77l (2) ), § 10(b) of the Exchange Act (15 U.S.C. § 78j(b) ) and Rule 10b-5 (17 C.F.R. § 240.10b-5), § 17(a) of the Investment Company Act (15 U.S.C. § 80a-17(a) ), California Corporations Code § 25401, and common law fraud. According to appellants, the question is whether Tabor may also be liable under these provisions as a coconspirator or as an aider and abettor of Randolph.
 
 I. Scienter
 
 15
 Summary judgment is proper only where there is no genuine issue as to any material fact. All inferences that can be drawn from the supporting documents must be viewed in a light most favorable to the party opposing summary judgment. Spectrum Financial Companies v. Marconsult, Inc., 608 F.2d 377, 380 (9th Cir. 1979), cert. denied, 446 U.S. 936, 100 S.Ct. 2153, 64 L.Ed.2d 788 (1980).
 
 
 16
 Where intent is a primary issue, summary judgment is generally inappropriate. Drawing inferences favorably to the nonmoving party, summary judgment will be granted only if all reasonable inferences defeat the plaintiff's claims. Vaughn v. Teledyne, Inc., 628 F.2d 1214, 1220 (9th Cir. 1980). The moving party's burden is therefore a heavy one.
 
 
 17
 We believe Tabor has not met his burden and that summary judgment was improper.
 
 
 18
 Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), held that a showing of scienter was required to make out a claim under § 10(b) and Rule 10b-5. It defined scienter as a "mental state embracing intent to deceive, manipulate, or defraud."[1] Id. at 193 n.12, 96 S.Ct. at 1381 n.12.
 
 
 19
 Fringe participants in illegal securities transactions have been brought within the scope of the securities laws with the application of criminal and tort theories of liability. Alleged coconspirators have been held liable for the acts of direct violators of § 10(b) and Rule 10b-5, when they knew of the fraud and assisted the overall scheme. See, e.g., Dasho v. Susquehanna Corp., 380 F.2d 262 (7th Cir.), cert. denied, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 470 (1967); Texas Continental Life Ins. Co. v. Dunne, 307 F.2d 242 (6th Cir. 1962); Kardon v. National Gypsum Co., 69 F.Supp. 512 (E.D.Pa.1946).
 
 
 20
 Aider and abettor liability has been implied in the terms of § 10(b) and Rule 10b-5 when (1) a primary violator has committed a securities law violation, (2) the defendant knew of the violation, but (3) nonetheless knowingly and substantially assisted the primary violator.[2] See Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38 (2d Cir.), cert. denied, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978); Woodward v. Metro Bank of Dallas, 522 F.2d 84 (5th Cir. 1975). Cf. Landy v. Federal Deposit Insurance Corp., 486 F.2d 139, 162 (3rd Cir. 1973), cert. denied, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974) ("independent wrong" instead of independent securities violation).
 
 
 21
 Considering this range of potential liability, we hold that there remains a material issue concerning Tabor's knowledge and his participation in the scheme.
 
 
 22
 Several facts support the inference that Tabor knew or should have known that the purpose of his involvement was to conceal Randolph's interest. A reasonably cautious investor would find strange Randolph's profit-splitting proposal. He would wonder why Randolph, who had the ability to guarantee against loss, did not simply purchase the stock in his own name and keep all the profit for himself.
 
 
 23
 It is also unusual that Tabor would not tell MacIntyre, his longtime business partner, broker, and financier, of the Randolph arrangement. It is reasonable to conclude that if Tabor did not know or suspect that the purpose of his involvement was to shield Randolph's interest, he would have consulted MacIntyre, especially since the VSI offering circular indicated this to be a high risk investment and since Tabor's losses were to be guaranteed by someone he supposedly knew little about.
 
 
 24
 It may be further inferred that Tabor actually knew of the scheme to manipulate the VSI market. His failure to document his agreements with Randolph and MacIntyre is suspicious. Though such a failure is not uncommon, it may imply that Tabor was certain his investment would not result in loss and that he was conscious of impropriety. Tabor's willingness to devote $37,500 of borrowed money for only one-third of the profits and his selling through Snodgrass rather than his friend MacIntyre are also suspicious and give rise to inculpatory inferences.
 
 
 25
 Though alternative inferences may be drawn,[3] this ambiguity convinces us that Tabor has failed to meet his burden and that an issue remains regarding his scienter. Drawing inferences favorable to the Funds from his affidavit alone, we hold that summary judgment was improper.
 
 II. Duty
 
 26
 Tabor argues that summary judgment was proper because he owed no duty of disclosure to the Funds.
 
 
 27
 It is true that where a defendant trades on inside information, he will not be liable under § 10(b) unless he owes a duty to his buyer or seller. Chiarella v. United States, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). But this is not a case of insider trading like Chiarella. There the Supreme Court held that mere possession of nonpublic market information does not give rise to a duty to disclose under § 10(b). More than possession of "inside information" has been alleged here, viz., a scheme to manipulate stock prices.
 
 
 28
 Even if a duty to disclose arising from mere knowledge of the scheme did not precede the sale, a duty to disclose arose when he knowingly or recklessly assisted or participated. Strong v. France, 474 F.2d 747, 752 (9th Cir. 1973) (knowing assistance of or participation in fraudulent scheme gives rise to duty to disclose).
 
 
 29
 Because his affidavit does not foreclose the possibility that in his borrowing, buying, and selling Tabor knew or should have known of Randolph's scheme, we hold that summary judgment is not compelled by a lack of duty to the Funds.
 
 III. Other Provisions of the Securities Laws
 
 30
 Our analysis has related to § 10(b) of the 1934 Act and Rule 10b-5 thereunder. Because we believe there exist genuine issues regarding Tabor's scienter and participation within the range of potential liability under this section and rule, we do not consider the application of similar analysis to other federal and state provisions under which AF's claims against Tabor have been pleaded. We leave to the trial court the determination of the full extent of Tabor's liability.[4]
 
 
 31
 We reverse the summary judgment for Tabor, remand for trial, and direct that the district court first decide the status of implied secondary liability. See footnote 2, supra.
 
 
 32
 REVERSED.
 
 
 
 *
 Of the District of Oregon
 
 
 [1]
 The Court specifically left open the question whether "in some circumstances" reckless behavior is sufficient for liability under this section and rule. In a case that involved misrepresentations and omissions in connection with the sale of stock, we have decided that recklessness is sufficient for direct violator liability. See Nelson v. Serwold, 576 F.2d 1332 (9th Cir.), cert. denied, 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978)
 
 
 [2]
 Our inquiry relates only to whether summary judgment was proper on claims against Tabor as a coconspirator and aider and abettor of Randolph. We assume, as we have before, see Little v. Valley National Bank, 650 F.2d 218 (9th Cir. 1981); Strong v. France, 474 F.2d 747 (9th Cir. 1973), the existence of such "secondary" liability. We have noted elsewhere today, however, that the status of implied secondary liability under the securities laws is in doubt. See Admiralty Fund v. Hugh Johnson & Co., No. 79-3820, --- F.2d ---- at ---- n.12 (9th Cir. May 24, 1982)
 We do not now decide the status of secondary liability in this circuit because the issue was not briefed or argued and because, given the current development of the record, it should be considered in the first instance by the district court. The district court on remand will decide first if, as a legal matter, secondary liability survives.
 
 
 [3]
 Tabor argues that his and MacIntyre's failure to draw a loan and security agreement does not support the inculpatory inference that he and MacIntyre knew of the scheme and were certain of its outcome. He points to several facts that explain the absence of the agreement: (1) he and MacIntyre were long-time friends and business associates; (2) loans to him from MacIntyre were customarily never documented; (3) MacIntyre was assured against risk because he always had recourse against the profits of their joint horse-breeding enterprise
 Though these facts suggest that noninculpatory inferences may be drawn from the absence of an agreement, the district court's obligation is to draw inferences in favor of the non-moving party. Adickes v. S. H. Kress and Co., 398 U.S. 144, 157-59, 90 S.Ct. 1598, 1608-09, 26 L.Ed.2d 142 (1970). With this obligation, it properly drew inculpatory inferences from the absence of the agreement.
 
 
 [4]
 The existence of conspirator and aider and abettor liability under these other provisions is doubtful. While § 10(b) and Rule 10b-5 are more elastic in language and have historically supported the implication of a broad private right of action, these remaining sections are more specific and rigid in their terms
 For example, applying the strict statutory construction approach dictated by the Supreme Court's recent decisions, see Admiralty Fund v. Hugh Johnson & Co., No. 79-3820, --- F.2d at ---- (9th Cir., May 24, 1982), the existence of aider and abettor liability under § 17(a) of the Investment Company Act is doubtful. This section prohibits, in the absence of SEC clearance, affiliated persons from selling their own securities to investment companies.
 Even if a private right of action could be implied within the terms of this section, its terms read in conjunction with § 48 (which provides that an affiliated person violates the Act when he causes another to do what for him would be a violation) indicate that Congress intended only affiliated persons themselves to be liable.