Berge A. ANDERSON, et ux., Plaintiffs-Appellees,

v.

AUROTEK, et al., Defendants,

and

Willard E. Matheson, Defendant-Appellant.

Dr. Berge ANDERSON, Plaintiff-Appellee,

v.

AUROTEK, et al., Defendants,

and

Lorraine J. Peters, surviving spouse and Personal Representative of James C. Peters, Defendant-Appellant.

Nos. 84–3644, 84–3645.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 6, 1984.

Decided Sept. 17, 1985.

Christopher B. Wells, Lane, Powell, Moss & Miller, Seattle, Wash., and John G. Schultz, Leavy, Schultz & Sweeney, Pasco, Wash., for plaintiffs-appellees.

Douglas Branson, Professor of Law, University of Puget Sound School of Law, Tacoma, Wash., for defendants/defendants-appellants.

Before BROWNING, Chief Judge, GOODWIN and SKOPIL, Circuit Judges.

## PER CURIAM

Defendants Matheson, Peters, and Rutledge formed a joint venture to exploit the Yosemite mining claim in Idaho, one of a number of claims owned by Mother Lode, a corporation. The three purchased 75% of Mother Lode's stock, and caused Mother Lode to transfer the mining claims to themselves as joint holders. They also informed Aurotek, a corporation, to develop the Yosemite claim, each taking one-third of its stock. Rutledge was to raise the necessary capital and see that required legal work was done; Matheson was responsible for the day-to-day operations of the venture; and Peters was to furnish advice for on-site mining.

Rutledge contacted co-defendants Dootson, an attorney-CPA, and Lind, a tax attorney, to help organize the venture and draw up the necessary legal documents. Lind, Dootson and Rutledge brought in co-defendant Skaggs, a retailer of tax shelters, to sell interests in the mining venture to private investors. Investors were offered a package consisting of a fractional interest in the mining claim and a contract with Aurotek to provide the necessary mining services.

Lind referred Skaggs to the plaintiff, Anderson, whom Lind knew to be looking for a tax shelter. Anderson purchased 120 of 223 undivided interests in the claim from Matheson, Rutledge and Peters for $1,614.36 in cash and a promissory note for $6,457.44. He also executed an Operating Agreement with Aurotek under which he was to contribute $300,000 cash and a $600,000 promissory note in return for mining services. Neither the fractional interest nor the Operating Agreement was registered with the SEC or the appropriate Washington state agency.

Aurotek ran out of money without finding gold. Matheson, through Skaggs, asked Anderson to pay the promissory note. Anderson brought this action under state and federal Securities Acts against various entities and individuals involved in the venture. In due course Anderson moved for summary judgment under Sections 12(1) and 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(1)–(2) (1982), and analogous provisions of Washington statutes.[1] The district court granted summary judgment against several of the defendants. Peters and Matheson appeal. We examine each possible basis for the district court's decision against these two defendants.

## I.

Section 12(1) of the Securities Act of 1933 imposes liability on any person who "offers or sells a security" in violation of Section 5 of the 1933 Act, 15 U.S.C. § 77e. Section 5 forbids the offer or sale of unregistered securities in interstate commerce, unless the securities are exempt from registration. *SEC v. Murphy*, 626 F.2d 633, 640 (9th Cir.1980). Matheson and Peters argue they did not "offer or sell a security" within the meaning of Section 12(1), or at a minimum that determining whether they did or did not do so requires resolution of disputed issues of fact.

1. Because the provisions in the relevant federal and state statutes do not differ in any respect material to this appeal, we address only the federal statute.

Anderson contends the undisputed facts establish Matheson and Peters are liable as "participants" in the sale to plaintiff of a "security" consisting of the fractional interest in the mining claim and the Operating Agreement with Aurotek or, at a minimum, are liable as "issuers" and sellers to plaintiff of the fractional interest. We examine each claim in turn.

◼ The term "seller" for purposes of Section 12 includes not only persons who transfer title, but also "participants" whose acts are "both necessary to and a substantial factor in the sales transaction." *Murphy*, 626 F.2d at 649–50.[2] "The test is whether the injury to the plaintiff flowed directly and proximately from the actions of the defendant." *Admiralty Fund v. Jones*, 677 F.2d 1289, 1294 (9th Cir.1982).

◼ The proximate cause analysis required by *Murphy* and *Jones* usually involves a question of fact for the jury. *See* W. Prosser, *Handbook of the Law of Torts*, 289–90 (4th ed. 1971). There are exceptions. In *Murphy*, the defendant's participation in the securities transaction was so pervasive that we found "[t]he conclusion that Murphy engaged in steps necessary to the distribution is inescapable," and therefore affirmed the grant of summary judgment. 626 F.2d at 652. In the present case neither Matheson nor Peters played so central a role in the arrangements for financing the project. Matheson consistently stated he had nothing to do with raising capital for the venture and did not deal with investors. Matheson did not meet Anderson until Anderson visited the mining site eight months after the purchase. Matheson's status as president and a promoter of Aurotek does not establish as a matter of law that he was a necessary or substantial factor in Anderson's purchase, especially in light of evidence that his responsibilities focused on technical and engineering aspects of the venture. While

it is true that Matheson controlled the expenditure of all funds contributed by investors, reported periodically to investors on the progress of the venture, and provided necessary mining and management expertise, these activities took place *after* investors had purchased their interests, and cannot be presumed to have proximately caused Anderson's purchase.

Peters' participation in the sale to Anderson was even less substantial. Evidence that Peters participated in forming Aurotek, selecting and obtaining ownership of the mining property, and supervising mining operations at the site reflects his significant status in the project as a whole but, without more, cannot be found to have been "both necessary to and a substantial factor in the sales transaction" or to have proximately caused Anderson's loss.

At first blush, Anderson's assertion that Matheson and Peters were at least the issuers and sellers of the fractional interest in the Yosemite claim to Anderson, would appear to be beyond factual dispute. However, we are convinced a factual dispute must be resolved to determine the merits of Matheson and Peters' contention that when viewed in context and in light of "economic realities," *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 848–49, 95 S.Ct. 2051, 2058–59, 44 L.Ed.2d 621 (1975), the fractional interest in the claim (for which Anderson advanced $8,071) was merely a part of an overall investment package that included the Operational Agreement with Aurotek (for which Anderson advanced $900,000); that Aurotek, and not Matheson, Peters and Rutledge, was the issuer and seller of the investment package; and that the individual defendants' act of executing the assignment of the interest in the claim was merely pro forma.

## II.

◼ We turn to section 12(2) of the 1933 Act, 15 U.S.C. § 77*l* (2). This provision cre-

---

**2.** Matheson and Peters contend the concept of "participant" liability was rejected in *Admiralty Fund v. Jones*, 677 F.2d 1289, 1294 n. 4 (9th Cir.1982); *Admiralty Fund v. Tabor*, 677 F.2d 1297, 1299 n. 2 (9th Cir.1982); and *Admiralty Fund v. Hugh Johnson & Co.*, 677 F.2d 1301, 1311 n. 12 (9th Cir.1982), which questioned the related concept of "aider and abetter" liability. The argument is foreclosed by *Harmsen v. Smith*, 693 F.2d 932, 944 (9th Cir.1982).

ates liability for the offer or sale of a security in interstate commerce by means of a prospectus or oral communication that includes an untrue statement or omission of a material fact.

Unlike section 12(1), section 12(2) provides an explicit defense for an offeror or seller who "did not know, and in the exercise of reasonable care could not have known, of such untruth or omission." In addition, section 12(2) requires the omission or misstatement to be "material," a mixed question of fact and law which can be resolved on summary judgment only if the established omissions or misstatements are "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 450, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757 (1976) (quoting *Johns Hopkins University v. Hutton*, 422 F.2d 1124, 1129 (4th Cir.1970)).

Determining which alleged misstatements and omissions Matheson or Peters knew or should have known about requires evaluation of facts disputed on this record. Matheson stated in his deposition that he did not limit representations made by his co-defendants to investors, since it was not his function to control others; that he was unaware the documents received by investors did not disclose the amount of sales commissions until those documents were signed and returned by the investors; and that he relied on Lind, Rutledge, Dootson and Skaggs to provide information to investors, and was unaware the securities laws required a prospectus to be issued. Peters' deposition was not taken—he died shortly after suit was filed. The record is devoid of any evidence indicating whether he knew or should have known of any of the alleged misrepresentations or omissions.

The materiality of the alleged omissions or misrepresentations also raises disputed questions of fact. Although Anderson recites numerous alleged omissions covering the spectrum of information that should have been available, whether these omissions affected his investment decision is still in dispute. The representation that Anderson would receive a 3-to-1 tax writeoff and that the mine would be profitable, were unquestionably material, but the parties dispute whether these representations were actually made.

### III.

Defendant Peters died shortly after this lawsuit was filed. The amended complaint added Peters' wife and the Peters' marital community as defendants. Mrs. Peters filed an answer and counterclaim as surviving spouse and personal representative of her late husband's estate.

Mrs. Peters contends Anderson's action against the estate is barred by Anderson's failure to comply with Washington's Non-Claim Statute, Wash.Rev.Code §§ 11.40.010–.150 (1974), which requires a plaintiff whose action is pending against a deceased at the time of his death to substitute the decedent's personal representative within four months of first publication to creditors or of the filing of a copy of such notice, whichever is later. Wash.Rev.Code § 11.40.100.

Anderson argues this is a procedural issue governed by federal rather than state law. Regardless of whether state or federal law governs the issue, Anderson's claim is not barred. Under Fed.R.Civ.P. 25(a)(1), a motion for substitution following the death of a party must be made "not later than 90 days after the death is suggested upon the record."

Under Wash.Rev.Code § 11.40.100, Anderson has four months from the filing with the court of a copy of the notice of death to move to substitute the decedent's personal representative. Because Mr. Peters' death was neither suggested on the record nor noticed by filing with the court, Anderson's time to move for substitution of Peters' personal representative has not yet begun to run under either Fed.R.Civ.P. 25(a)(1) or Wash.Rev.Code § 11.40.100.

REVERSED and REMANDED.