**SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellant,**

v.

**Gerald L. ROGERS; International Exchange, S.A.; Compagnie Miniere Paul Isnard, S.A.R.L.; Diversiones Internacionales, S.A.; Norsul Oil Mining, Ltd.; Wayne E. Fowler; Paula Molina d/b/a Telecom, et al., Defendants-Appellees.**

No. 85–5841.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 8, 1986.

Decided June 3, 1986.

David A. Sirignano, S.E.C., Washington, D.C. for plaintiff-appellant.

Pierce O'Donnell, O'Donnell & Gordon, Los Angeles, Cal., for defendants-appellees.

Before PREGERSON, BEEZER, and NOONAN, Circuit Judges.

PREGERSON, Circuit Judge.

The Securities and Exchange Commission ("SEC") appeals from the district court's finding that appellee Gerald Rogers did not substantially participate in three public offerings of tax-shelter investments promoted by International Monetary Exchange, S.A. ("IME"). The SEC charged Rogers with selling unregistered securities in violation of section 5 of the Securities. Act of 1933 ("the 1933 Act"); using fraudulent practices in the sale of securities in violation of section 17(a)(1) of the 1933 Act and section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder. The SEC also charged Rogers with aiding and abetting violations of the antifraud provisions of the securities laws. After a bench trial, the district court entered judgment in favor of Rogers on all charges.

## I. BACKGROUND

IME is a Panamanian organization specializing in the promotion of tax-shelters. In annual public offerings from 1978 through 1980 in the United States, IME promoted tax-shelter investment programs called "Gold for Tax Dollars" (GFTD). These programs involved mining rights to gold-bearing properties in Panama (in 1978) and French Guiana (1979–80). In each of the three years of the GFTD offerings, thousands of United States investors were solicited by direct mail, telephone, newspaper advertisements, and investors' seminars. Hundreds of sales persons and brokers were engaged in GFTD sales activities.

### A. *The Panamanian Concession*

In 1975 the Panamanian government awarded Concession No. 35 for placer gold mining to Tuquesa Mining, S.A. (TMSA). TMSA was controlled by Tylor F. Kittredge, an experienced American geologist who had explored the area over a six year period and had written numerous geological and assay reports for the Panamanian government. These reports represented

that commercial quantities of gold existed in Concession No. 35.

In early 1978, Kittredge met Gerald Rogers, who was acting as an agent for a company called Diversiones Internationales, S.A. (DISA). On the basis of Kittredge's representations, Rogers, who was not a geologist or mining engineer, leased for DISA the right to mine gold on Concession No. 35.

In 1978, when IME introduced the GFTD program, DISA agreed to sublease its rights in Concession No. 35 to IME. Although investors had the right to mine their own lots individually and select their own mining contractor, most chose IME as their agent. IME then entered into contracts with Tuquesa Amalgamated, S.A., a Panamanian company, which was to arrange for the development of the investor's individual tract. IME selected Norsul Oil and Mining Ltd., a public Canadian company, as the overall mining contractor for those investors who designated IME as their agent.[1]

DISA and Norsul entered into a joint venture agreement on June 18, 1979, in which DISA retained Norsul to operate Concession No. 35. Dr. Wayne E. Fowler, president of Norsul, relied on Kittredge's reports in making his projections concerning the future recovery of gold.

Because Kittredge was disappointed that his company, TMSA, was not selected as the overall mining contractor, he interfered with Norsul's efforts to mine the property. Further, TMSA and Kittredge opposed the efforts by DISA and Norsul to qualify to develop and mine Concession No. 35. Notwithstanding these repeated interferences, DISA and Norsul were able to obtain the necessary financial and technical approvals for their mining plan from the Panamanian government by February 1980.

In 1980, Norsul began mining the Concession. However, Norsul's mining efforts were hampered by adverse weather conditions and severe flooding. Norsul continued to encounter constant harassment from Kittredge, government-ordered work stoppages at Kittredge's instigation, and threats of law suits from Kittredge.

By late 1980, it became clear to DISA and to Norsul that Concession No. 35 would not be profitable for investors because Kittredge had grossly exaggerated the quantity and quality of gold present. The representations and estimates in Kittredge's promotional brochure were erroneous. Instead of 125 million cubic meters of gold-bearing gravel with a grade of 0.77 gms, the Norsul mining operation showed that the quantity of gold-bearing gravel was small and the actual grade was poor. At trial, Kittredge appeared as a key witness for the SEC and admitted that he had falsified his geological reports in numerous material respects.[2] The district court found that Norsul had conducted a professional mining operation on the Concession and that failure of the operation was not attributable to Norsul or DISA.

In March 1981, the Panamanian government cancelled the Concession, citing its unprofitability and the alleged violation by DISA of a Panamanian mining code provision (Article 100A) requiring prior government approval before the public dissemination of information about the value of a mining Concession.[3] IME notified investors of the cancellation of the Concession and offered them the opportunity to have their investments transferred to another placer gold mining claim outside of Panama.

---

1. Norsul's president, Dr. Wayne E. Fowler, assumed responsibility for the mining project. The district court found Fowler to be an experienced and competent geologist and miner, and to be a highly credible witness at trial.

2. The court found that Kittredge was not a credible witness and declined to accept his testimony as establishing any material element of the SEC's case.

3. The SEC's expert witness on Panamanian law testified that, based on his experience, he knew of no other concession that had been cancelled because of a violation of Article 100A of the Panamanian mining code. Kittredge had previously violated the provision, but his concession had not been cancelled.

## B. *The French Guiana Concession*

In early 1979, DISA, represented by its agent Rogers, acquired from an American, William DeNicolo, a 94% interest in Compania Miniere Paul Isnard, S.A.R.L. (CMPI, S.A.R.L.). CMPI, S.A.R.L. held the Paul Isnard placer gold mining concession in French Guiana. Earlier geological studies prepared by the French government and by an American experienced in placer gold mining, James Knapp, confirmed that the Paul Isnard gold concession was very valuable and contained millions of tons of gold in alluvial deposits. In 1979 and in 1980, CMPI, S.A., a Panamanian corporation acting on behalf of CMPI, S.A.R.L., entered into sublease agreements for individual claims or lots with investors found by IME. Using a format similar to the Panamanian GFTD program, investors were offered the opportunity to lease designated mineral claims or lots in exchange for advance payment for all development expenses. IME sold gold options, having a term of approximately seven years, for the investors.

In April 1979, Norsul entered into a management agreement with CMPI, S.A.R.L., to serve as technical supervisor for the mine. Norsul prepared a development plan, ordered millions of dollars worth of advance mining equipment, hired an extensive American and local work force, and completed in one year an 85–mile jungle supply road. At the time of the trial, development and extraction had been ongoing at Paul Isnard since 1979. The French Guiana Bureau of Mines and the Bureau de Recherche Geologique et Miniere supervised the mining activities of the Paul Isnard concession. Under DISA's direction, the gold production at the Paul Isnard concession exceeded the predictions made by the French and American geologists. The profit potential, based on expert evaluation, was excellent.[4] The district court concluded that the mining operation at the Paul Isnard concession was "professional."

## C. *The SEC's Charges*

The SEC brought charges against Rogers and nineteen other individual and corporate defendants alleging (1) that the GFTD mining investments in both Panama and French Guiana were securities that should have been registered with the SEC under section 5 of the 1933 Act, 15 U.S.C. § 77e; (2) that Rogers engaged in the sale of these unregistered securities without registering as a broker or dealer; and (3) that Rogers and other defendants had violated the antifraud provisions of the securities laws, section 17(a)(1) of the Securities Act of 1933, and section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 77q(a)(1) and 78j(b), by making false and misleading statements in connection with the Panamanian venture, and by failing to disclose material information to the investors.

## D. *The Letter Rogatory*

Seven months before the trial, on June 19, 1981, the district court issued, at the SEC's request, a letter rogatory to the government of Panama asking that various former officers of IME and DISA be deposed. The Panamanian Government granted this request with respect to Mireye Uribi Prada, a former president of DISA and secretary of IME, on May 11, 1982. Immediately, the SEC moved the district court to permit it to supplement the record after taking Prada's deposition. The district court, which had been trying the case for about five weeks, denied the SEC's request on May 13, 1982.

## E. *The District Court's Findings and the SEC's Appeal*

The district court found that the GFTD investments were securities, but that Rogers did not act as a broker or dealer in their sale and that his involvement with the GFTD program was insufficient to make him a seller for section 5 purposes. Further, the district court concluded that Rogers neither violated the antifraud provisions, nor substantially assisted or knew of

---

**4.** One individual elected to mine his own plot and travelled to French Guiana to oversee mining operations. This operation, without Nor- sul's assistance, was successful, and gold was recovered from mining only a portion of his claim.

violations by IME.[5] The SEC timely appealed.[6]

## II. STANDARD OF REVIEW

■ We review a district court's decision to grant or deny injunctive relief as to a particular defendant for abuse of discretion or for application of erroneous legal principle. *SEC v. Goldfield Deep Mines Co. of Nevada*, 758 F.2d 459, 465 (9th Cir.1985).

■ We review the district court's findings of fact under the clearly erroneous standard. *United States v. McConney*, 728 F.2d 1195, 1202–04 (9th Cir.) (en banc), *cert. denied*, — U.S. ——, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). "A finding of fact is clearly erroneous when the reviewing court on the entire evidence is 'left with the definite and firm conviction that a mistake has been committed.' " *Dollar Rent a Car of Washington, Inc. v. Travelers Indemnity Co.*, 774 F.2d 1371, 1374 (9th Cir.1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948).

· The clearly erroneous standard applies also to findings that the district court adopts from proposed findings submitted by the parties. *Anderson v. City of Bessemer City*, — U.S. ——, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) ("[E]ven when the trial judge adopts proposed findings verbatim, the findings are those of the

court and may be reversed only if clearly erroneous."). Special deference is paid to the district court's credibility determinations. *Id.* at 1512 ("When findings are based on determinations regarding the credibility of witnesses, Rule 52 demands even greater deference to the trial court's findings. . . .").

■ A district court's determination of negligence or scienter is reviewed as a finding of fact. *McConney*, 728 F.2d at 1204; *Goldfield Deep Mines*, 758 F.2d at 465.

■ We review the district court's denial of the SEC's motion to reopen or supplement the trial record for abuse of discretion. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 331–32, 91 S.Ct. 795, 802, 28 L.Ed.2d 77 (1971); *Ellis v. Brotherhood of Railway, Airline & Steamship Clerks*, 685 F.2d 1065, 1071 (9th Cir.1982), *aff'd in part, rev'd in part on other grounds*, 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984).

## III. ANALYSIS

On appeal, the SEC presses its contentions that Rogers's substantial participation in the sale of unregistered securities violated section 5 of the 1933 Act, and that Rogers violated the antifraud provisions of the Securities Laws, sections 17(a)(1) and 10(b), and Rule 10b–5 promulgated thereunder.[7]

---

**5.** The district court held that Rogers' conduct was neither "negligent [n]or unreasonable," and that, therefore, Rogers could not be held liable under either § 17(a)(1) or § 10(b) and Rule 10b–5 promulgated thereunder.

**6.** The SEC suggests that the district court's findings in favor of Rogers resulted from the court's reliance on perjured testimony. The SEC notes that two years after the trial in this action, a federal grand jury in Colorado indicted Rogers on charges of tax-shelter fraud and other offenses resulting in part from his involvement in the GFTD offerings. *United States v. Rogers*, Cr. No. 84–Cr–337 (D.Colo., superseding indictment filed November 30, 1984). In the criminal case, there is a defense motion now pending that seeks to use the lower court's findings in the instant case to preclude the United States from litigating certain issues. In response, the U.S. Attorney's Office for the District of Colorado

informed the court presiding in the criminal case that it plans to show that evidence presented to the grand jury demonstrates that the judgment for Rogers in the instant civil case was procured by false testimony.

If the SEC's allegations of perjured testimony are supported by evidence, the SEC's proper recourse is to present the district court with the evidence and to ask for relief from the judgment pursuant to Fed.R.Civ.P. 60(b). *See, e.g., Peacock Records, Inc. v. Checker Records, Inc.*, 365 F.2d 145, 147–48 (7th Cir.1966) (district court's refusal to set aside judgment based in part on perjured testimony constituted abuse of discretion), *cert. denied*, 385 U.S. 1003, 87 S.Ct. 707, 17 L.Ed.2d 542 (1967).

**7.** On appeal, the SEC does not contest the district court's finding that Rogers did not act as a broker or dealer in connection with the GFTD programs.

## A. *Section 5 Liability*

■ A defendant may be held liable under section 5 of the 1933 Act if he is "directly responsible" for the distribution of unregistered securities. *SEC v. Murphy*, 626 F.2d 633, 649 (9th Cir.1980). This standard, which applies to both SEC enforcement actions and actions for damages under section 12 of the 1933 Act,[8] requires that the defendant's conduct be both necessary to, and a substantial factor in, the unlawful transaction. *Id.* at 650–52; *Anderson v. Aurotek*, 774 F.2d 927, 930 (9th Cir.1985) (per curiam); *see also SEC v. Holschuh*, 694 F.2d 130, 140 n. 14 (7th Cir.1982) (necessary and substantial participation required for liability in SEC enforcement actions).

■ The first prong of this standard requires a defendant's participation to be a "but for" cause of the unlawful sale, and the second requires the participation to be more than "de minimis." *Murphy*, 626 F.2d at 650–52. While "substantial participation" is a concept without precise bounds, previous cases suggest that one who plans a scheme, or, at the least, is a substantial motivating factor behind it,[9] will be held liable as a seller. *Id.* at 652; *see Aurotek*, 774 F.2d at 930.[10] Fringe participants, although possibly liable as aiders and abettors, are not liable as sellers under section 5. *See Admiralty Fund v. Tabor*, 677 F.2d 1297, 1299 (9th Cir.1982); *see also Murphy*, 626 F.2d at 651 n. 19.

The SEC argues that the district court erred in determining the extent of Rogers' participation in the scheme. Thus, we review the district court's findings under the clearly erroneous standard.[11]

---

**8.** In *Murphy*, we noted that two different tracks of liability have developed for section 5 violations. Under section 12 of the 1933 Act, a buyer may obtain damages from a seller of unregistered securities. In this type of action, the necessary and substantial participant test has been uniformly applied. *See Murphy*, 626 F.2d at 650.

In SEC enforcement actions, courts have spoken only of "necessary" participation. *See id.* at 651–52. However, the *Murphy* court concluded that little practical difference existed between the two standards, and that no case had granted injunctive relief without finding substantial participation. *Id.* Hence, the necessary and substantial participant standard would seem applicable in the instant case.

**9.** In *Murphy*, we held liable under section 5 a defendant who devised the corporate financing scheme and was deeply involved in the sale of unregistered securities to investors. *Id.* at 649–52. The Seventh Circuit relied on *Murphy* in holding liable under section 5 a defendant who designed a scheme to sell unregistered securities, even though the defendant had no contact with investors. *Holschuh*, 694 F.2d at 140. The Seventh Circuit held that although "evidence of greater participation in the solicitation campaign was present in *Murphy*, ... we find no indication that the court regarded that factor as essential to its disposition of the case." 694 F.2d at 140.

**10.** In section 12 actions for damages, we have used a proximate cause analysis, finding liability if a plaintiff's injury "flowed directly and proximately from the actions of the defendant."

*Aurotek*, 774 F.2d at 930 (quoting *SEC v. Seaboard Corp.*, 677 F.2d 1289, 1294 (9th Cir.1982)).

While some courts have suggested that standards for liability might be broader in SEC enforcement actions than in section 12 actions for damages, *see Murphy*, 626 F.2d at 649 n. 17; *SEC v. Coven*, 581 F.2d 1020, 1027–28 (2d Cir. 1978), this principle has not been applied in this circuit. In any event, the proximate cause analysis seems a reasonable approach to determining substantial participation.

**11.** The SEC contends that the district court's findings should be given little deference because, the SEC alleges, they were adopted verbatim from the proposed findings submitted by Rogers. As noted previously, however even when a district court adopts findings verbatim, the findings are those of the court and are reversible only if clearly erroneous. *See Bessemer City*, 105 S.Ct. at 1511.

Further, in this case, the record does not support the SEC's assertion that the district judge uncritically accepted Rogers' proposed findings. A comparison of the district court's findings with Rogers' proposed findings reveals that the district court rejected 29.7% of Rogers' proposed findings and materially modified another 17% of the findings. Thus, the district court did not "uncritically" accept Rogers's proposed findings.

Also, it should be noted that the submission of proposed findings can play a useful role in the orderly management of complex litigation. *See* Manual for Complex Litigation §§ 21.3.3, 22.5.2 (West 2d ed. 1985). While the court's findings should reflect the judicial thought process, *see, e.g., United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 656 n. 4, 84 S.Ct. 1044, 1047, n. 4,

The district court found that Rogers acted as an agent for various entities involved in the GFTD programs, but neither organized the GFTD programs nor participated in the solicitation of investors. Specifically the court noted that Rogers did not: (1) act as a sales manager or salesman for GFTD nor control investor funds in the GFTD programs; (2) organize the IME sales task force, seek out investors, or make any representations to investors; (3) manage or supervise IME operations in Panama City or elsewhere; (4) prepare GFTD offering materials; or (5) participate in researching, writing, or editing the Kallen, Grant & Kosnett tax or securities opinions or the Whitman Ransom tax opinion. The SEC contends that these findings are clearly erroneous as uncontroverted evidence demonstrates Rogers's extensive role in the operation.

A review of the record does not demonstrate that the district court's findings are clearly erroneous. A few witnesses did indicate that they remembered Rogers participating in the sales of the GFTD investments. *See, e.g.,* Testimony of Ruth Gysbers (witness thought that she remembered Rogers speaking about the "general [GFTD] program" at a luncheon); Testimony of Donald Justice (Rogers made 30–40 minute presentation at a dinner in Panama on GFTD program); Testimony of William Meikle (Rogers instructed salesmen on proper technique for selling investments). However, the witnesses could not recall specific attempts by Rogers to sell the investments or to promote the GFTD scheme to investors.[12] Furthermore, the district court concluded that many of these witnesses called by the SEC lacked credibility or were interested parties.[13] The district court was not persuaded, based on the evidence presented, that Rogers had played a significant role in the sales of the GFTD programs.

Next, the district court found that Rogers had not helped prepare offering materials for the programs. An attorney for IME, James Kosnett, testified that Rogers had not participated in drafting or preparing legal opinions. Wayne Fowler, president of Norsul, whom the district court found to be a "highly credible witness," testified that he, and not Rogers, had supplied the information in the 1979 and 1980 offering circulars. Finally, the district court concluded, based on Kittredge's highly incredible testimony, that he, and not Rogers, had been the source for all information in the 1978 offering materials. The court's finding that Rogers did not supply the information in either offering circulars or legal opinions is supported by substantial evidence.

Finally, the district court found that Rogers neither created nor managed the GFTD scheme. Although one witness testified to having the impression that Rogers was "in charge" of the GFTD programs, little hard evidence existed to support this conclusion. To the contrary, the evidence indicated that Rogers did not organize the programs.[14]

---

12 L.Ed.2d 12 (1964), most court findings will parallel suggestions made by one of the parties. "Nevertheless, by parsing, rephrasing, and reorganizing the matters proposed by the parties, the court can demonstrate that the findings and conclusions are its own." Manual for Complex Litigation § 22.5.2. Clearly, here, the district court's findings are its own and are the thoughtful product of the court's independent judgment.

**12.** To the contrary, one witness testified that Rogers had not acted as a salesman when the witness called him to talk about the GFTD program. Further, the witness testified: "I enjoyed talking with him.... There was no pressure [to invest] that I felt in talking with him." Testimony of Harrison Kornfield. This testimony is consistent with Rogers' contention that he acted as a disinterested expert.

**13.** For example, Ruth Gysbers testified: "I don't think I can recall the content [of what Rogers said]. I would probably think he talked about the general program. I think he explained that the type of gold that was being mined in Panama was not nugget variety but the loose, light flaky type or whatever you want to call it....

I don't know what I read and what I heard there. I can't separate the two at this date."

**14.** It appears more likely that Eduardo McCullough, who negotiated with Fowler for Norsul to assume control over the mining operations and who owned a substantial, if not majority, share of IME stock, was the moving force behind the GFTD program. There is almost no

This is not a case where the evidence clearly supports one view over another. Were we reviewing this case *de novo*, we might reach a different conclusion based on the evidence presented. However, as the Supreme Court noted in *Bessemer City*, "[t]he reviewing court oversteps the bounds of its duty under Rule 52 if it undertakes to duplicate the role of the lower court." *Bessemer City*, 105 S.Ct. at 1511; *see Icicle Seafoods, Inc. v. Worthington*, —— U.S. ——, 106 S.Ct. 1527, 89 L.Ed.2d 739 (1986).[15] Thus, as a court of limited review, "we will not ransack the record, searching for mistakes," *Casillas v. United States Navy*, 735 F.2d 338, 343 (9th Cir.1984), but must abide by the clearly erroneous rule when reviewing a district court's findings. In this case, we conclude that the district court's findings as to Rogers's participation in the sale of unregistered securities were not clearly erroneous.

### B. *Violations of the Antifraud Provisions*

The SEC next contends that Rogers violated the antifraud provisions of the securities laws, section 17(a)[16] of the 1933 Act, 15 U.S.C. § 77q(a)(1), section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, or, at the least, aided and abetted IME's violations of these provisions.

#### 1. *Primary Liability*

■ To establish primary liability under the antifraud provisions, the SEC must establish that a defendant intentionally or recklessly misrepresented or failed to disclose a material fact in connection with the purchase or sale of securities. *Kehr v. Smith Barney, Harris Upham & Co.*, 736 F.2d 1283, 1286 (9th Cir.1984); *see Caravan Mobile Home Sales, Inc. v. Lehman Brothers Kuhn Loeb, Inc.*, 769 F.2d 561, 564 (9th Cir.1985); *see also Aaron v. SEC*, 446 U.S. 680, 695, 697, 100 S.Ct. 1945, 1955, 1956, 64 L.Ed.2d 611 (1980) (scienter required for liability in SEC enforcement actions under sections 17(a)(1) and 10(b), and rule 10b–5).[17] Information is material if "there is a substantial likelihood that a reasonable investor would consider the information important in making an investment decision." *Caravan Mobile Home*, 769 F.2d at 565 (quoting *Vaughn v. Teledyne, Inc.*, 628 F.2d 1214, 1221 (9th Cir. 1980)).

#### a. *Material Omissions*

The SEC contends that Rogers failed to disclose material facts to investors. Specifically, the SEC charges: (1) that Rogers failed to disclose his substantial participation in the GFTD programs beyond that of disinterested expert; and (2) that Rogers failed to disclose to investors that he had previously been enjoined from future violations of the securities laws.

■ When an allegedly disinterested expert endorses an investment, information regarding his objectivity would be material to a potential investor. *See Zweig v.*

---

evidence that Rogers designed the tax-shelter investments.

15. In *Icicle Seafood,* the Supreme Court quoted with approval its statement in *Bessemer* that [t]he rationale for deference to the original finder of fact is not limited to the superiority of the trial judge's position to make determinations of credibility. The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise. Duplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to accuracy of fact determination at a huge cost in diversion of judicial resources.
106 S.Ct. 1527.

16. Section 17(a) of the Securities Act provides:

It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly —(1) to employ any device, scheme or artifice to defraud....
15 U.S.C. 77q(a)(1).

17. The district court found that "the SEC has failed to prove that the nature or degree of Rogers' involvement with the [GFTD programs] was sufficient to [find] that he participated in the alleged violations of the anti-fraud laws." The court further found that the SEC failed to prove that Rogers acted with the necessary scienter for liability under the antifraud provisions.

*Hearst Corp.*, 594 F.2d 1261, 1266 (9th Cir.1979). A finding that Rogers participated substantially in the operation would imply that he was not a disinterested expert. Similarly, information that the promoter of a tax-shelter program was recently enjoined in connection with a similar project would be material because a reasonable investor would want to know of such an occurrence before investing. *See Freschi v. Grand Coal Venture*, 767 F.2d 1041, 1048 (2d Cir.1985).

The SEC's argument that Rogers failed to disclose material information fails, however, because it is predicated upon the assumption that Rogers played a greater role in the GFTD programs than found by the district court. As noted in part 1 of this opinion, the district court's finding that Rogers acted merely as a fringe participant is not clearly erroneous. The finding that Rogers played only a peripheral role in the project are consistent with his contention that he acted as a disinterested expert.[18]

■ Further, a party must have a duty to disclose information before his failure to do so will support liability. *Strong v. France*, 474 F.2d 747, 752 (9th Cir.1973). Absent a finding of substantial participation in the GFTD programs, Rogers would not have had such a duty. *See, e.g., id.* (duty to disclose may arise in fiduciary relationships, upon possession of inside information, or upon knowing participation in a fraudulent scheme); *Cleary v. Perfectune, Inc.*, 700 F.2d 774, 777–78 (1st Cir. 1983) (no duty to disclose material facts for peripheral participants).

### b. *Material Misrepresentations*

■ The SEC contends that Rogers was responsible for misrepresenting to investors: (1) that gold was being extracted in commercial quantities from the Panamanian Concession when the operation was, in fact, unprofitable; (2) that CMPI, S.A., rather than CMPI, S.A.R.L., was the lessor of Concession No. 35; and (3) that all investor proceeds would go directly to development expenses, and thus could be deducted in the year of payment.

The evidence does not suggest that the district court's findings on these issues were clearly erroneous. First, the district court found that Kittredge's "geological reports were the source of virtually all of the geological statements in the 1978 GFTD offering materials which were challenged by the SEC." The SEC argues that Rogers verbally communicated this false information to investors[19] and instructed salesmen to use it in their presentations, but the record is controverted on this issue. Even had Rogers communicated this information concerning the Panamanian Concession, there is no indication that he knew it was false.[20] Further, there is no evidence that Rogers either prepared the offering materials listing the identity of the lessor as CMPI, S.A., rather than CMPI, S.A.R.L. or made a representation as to the identity of the lessor.

The SEC also contends that Rogers participated in leasing to investors more cubic meters of *proven* gold-bearing reserves

---

**18.** Further, the district court found that there was "no credible evidence that Rogers tried to conceal the prior injunction from anyone. Rogers volunteered to Fowler and his lawyer that he had had prior securities law problems and that an injunction had been entered against him." In *Freschi,* upon which the SEC primarily relies, the defendant had actively concealed the injunction previously issued against him. 767 F.2d at 1048. The failure to attempt to conceal the injunction supports the district court's finding that Rogers did not have the scienter necessary to support liability.

**19.** The SEC maintains that Rogers conveyed this information to Ruth Gysbers, but her testimony

on this issue was found to be very unreliable by the district court. *See supra* note 16.

**20.** The district court reasonably concluded that Rogers had no reason to suspect that Kittredge had erroneously reported the amount of gold on the Concession. Carlos Chavez, a mining engineer with the SEC testified that even he, confronted with Kittredge's reports, could not have verified their representations. In these circumstances, it would be unreasonable to hold that Rogers, a layman, was responsible for the accuracy of the information contained in the reports.

than actually existed. The SEC rests this argument on its contention that Rogers was "the single person responsible for investor leases." To reverse the district court on this issue, we would have to find that more proven reserves were leased than actually existed, that Rogers was involved in the leasing of the reserves to investors, and that Rogers should have known from Kittredge's reports that only a small amount of proven reserves actually existed at the Paul Isnard Concession. Insufficient evidence exists in the record to support such findings.

### 2. *Aiding and Abetting Liability*

■ To establish an aiding and abetting violation, the SEC must show that Rogers knowingly provided substantial assistance to another person's violation of the securities laws.[21] *Harmsen v. Smith*, 693 F.2d 932, 943 (9th Cir.1982), *cert. denied*, 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983); *Admiralty Fund v. Hugh Johnson & Co.*, 677 F.2d 1301, 1311 (9th Cir.1982).[22]

■ The district court did not find that IME had violated the antifraud provisions of the securities laws.[23] The court instead found that any inaccuracies contained in the 1978 offering materials were caused by Kittredge's erroneous reports. Evidence suggested that the mining operation performed by Norsul was professional, and that if IME had applied, the GFTD programs could have been registered as securities. Thus, the finding that IME did not make false and misleading statements is not clearly erroneous.

If the court had found a violation of the antifraud provisions, it does not appear that Rogers' participation would have been sufficient to justify even a violation for aiding and abetting. The district court found that Rogers had acted only as an agent for DISA in securing the lease of Concession No. 35 and the Paul Isnard Concession. On this basis, it would be difficult to conclude that Rogers materially assisted IME's securities violations.

### C. *The SEC's Motion to Supplement the Record*

The SEC contends that the district court abused its discretion in denying the SEC's motion to hold open the record while it took the deposition of Mireye Uribi Prada. The SEC made its motion three days before the close of a five week trial.

■ A district court should take into account, in considering a motion to hold open the trial record, the character of the additional testimony and the effect of granting the motion. 6A J. Moore, *Moore's Federal Practice*, ¶ 59.04[13] at 59–31 to 32 (2d ed. 1985). The court should also consider the diligence of the moving party, and any possible prejudice to the other party. *Zenith Radio Corp.*, 401 U.S. at 332, 91 S.Ct. at 803.

■ Prada's testimony in this case might have been of some benefit to the SEC had she testified that Rogers controlled investor funds. Further, Prada might have clarified whether T.T. Smith actually exists, and if not, who actually managed IME and the GFTD programs. The SEC was unable to procure at trial any witnesses from IME's management, and this clearly interfered with the SEC's ability to determine who bore responsibility for the GFTD programs.

However, although the SEC made clear to the district court the questions it wished to ask Prada, it did not know how Prada would have testified, or indeed, what evidence she would have provided. Thus, it is

---

**21.** The SEC apparently does not charge Rogers with aiding and abetting a violation of section 5, the prohibition against selling unregistered securities.

**22.** The district court found that Rogers neither provided substantial assistance to IME's alleged violations, nor had the scienter required for liability as an aider and abettor.

**23.** The district court specifically found that the "statements in the 1978, 1979, and 1980 GFTD offering materials were not false or misleading concerning potential economic benefits and risks to investors."

unclear whether Prada's testimony would have affected the outcome of the case.

Moreover, although the SEC contends that it acted with due diligence in attempting to procure Prada's testimony, a review of the sequence of events indicates that the SEC did not act as diligently as it might have. The district court, at the SEC's request, issued the letters rogatory on June 19, 1981. The SEC commenced the trial on April 12, 1982, without having heard from the Panamanian Government about the letters. Not until the letters were granted by Panama on May 11, 1982 with respect to Prada did SEC ask the district court to supplement the record. If the SEC believed that the testimony it sought was crucial to its case, it could have moved to continue the trial until it heard from Panama on the letters rogatory. Moreover, the SEC could have expedited the translation of the letters and their transmittal to Panama.

Because it is unclear that Prada's testimony would have significantly affected the SEC's case, it does not appear that the district court abused its discretion in denying the SEC's motion to supplement the record.

### CONCLUSION

The district court's findings that Rogers did not participate in the sale of unregistered securities are not clearly erroneous. Because Rogers did not participate in the sale of securities, he had no duty to disclose material information. Further, the district court's findings that Rogers did not make material misrepresentations are not clearly erroneous. The judgment of the district court is AFFIRMED.

NOONAN, Circuit Judge, dissenting:

*Anderson v. City of Bessemer City,* —— U.S. ——, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) instructs us not to reverse a trial judge who has adopted findings proposed by a party unless the findings are clearly erroneous. Trial judges, laboring under a heavy burden of cases, often have to rely on the findings prepared by the successful litigant. In the instant case, findings were prepared by Rogers and carefully scrutinized and corrected by a very able trial judge. Nonetheless, the scrutiny occurred not quite three years after the trial judge had heard the case. No reason appears in the record why this extraordinary lapse of time took place. Many matters were not fresh in the judge's mind. Reliance on counsel led to acceptance of a point of view and to findings which were clearly erroneous.

The trial court on September 14, 1982 enjoined IME (which had defaulted) from violating section 10(b) in the sale of GFTD securities and ordered it to account to investors for the GFTD program. Nonetheless, among the findings of the trial court taken in this instance without revisions from the findings prepared by Rogers is the finding, "The statements in the 1978, 1979 and 1980 GFTD offering materials were not false or misleading concerning potential economic benefits and risks to investors." This surprising finding is background for the court's clearly erroneous conclusion that Rogers did not aid or abet securities fraud.

That Rogers was a salesman for IME was well-established by testimony. It is not evident why Rogers' acts as a salesman were not "significant." Rogers played the misleading role of an "expert tax shelter designer" in the GFTD advertising. It strains credibility to the breaking point to believe that IME's use of Rogers' name with the false implication that he was a disinterested observer was done without Rogers' willing participation. In a scam such as IME was running it was of great assistance to have the name of someone who could be claimed as an expert on the prime objective of the potential customers, tax shelter. In this, as in many scams, the apparently disinterested and helpful third party—here Rogers—was instrumental in conning the customers. The shill is not insulated from liability because of his pretense at being peripheral and neutral. The trial court erred in finding that Rogers did not abet IME's fraud.

The trial court found that Rogers "did not participate in the preparation" of the Whitman and Ransom tax opinion but did find that he was "an agent" in supplying a set of assumed facts for the opinion. The finding that Rogers did not participate in preparing the opinion is at war with the finding that Rogers supplied the assumed facts and so is clearly error. The Whitman and Ransom documents, Rogers' undated letter to Victor Keen, and Victor Keen's testimony establish beyond dispute that Rogers did supply all of the facts for the tax opinion. The tax opinion was vital. Without it, there would have been no sale. Without the facts supplied by Rogers the opinion would have been no use to IME in selling its securities. Moreover, the so-called assumed facts gained credibility by their recitation in the honest lawyer's opinion which magnified their fraudulent impact.

The district court found that Kittredge's geological reports were the source of the untrue geological statements in GFTD offering materials. The finding is clearly erroneous by its incompleteness. Kittredge was the source, but in a report available to Rogers, Kittredge himself had characterized the drilling on the Rio Turquesa as not "meaningful." Moreover, another available report of his indicated that a mere 20 holes had been excavated in exploratory drilling; the GFTD sales brochure stated that there had been 400 exploratory holes. When Rogers chose to pass on this unmeaningful and untrue information as part of the GFTD sales pitch, he became a willing participant in fraud. Gold was not being extracted in commercial quantities from the Panamanian Concession, and Rogers knew that this was the case. Even a customer for a tax shelter does not want to throw his money into an empty hole or scatter it on untested earth. The possibility of great riches to be won was held out by Rogers along with the claimed certainty of lawfully reducing taxes. The representation as to gold was material as well as false.

Adverse inferences can be drawn from Rogers' invocation of the privilege against self-incrimination. *Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976); *Campbell v. Gerans*, 592 F.2d 1054, 1058 (9th Cir.1979). As the Supreme Court in *Baxter* quoted Justice Brandeis, "Silence is often evidence of the most persuasive character." Unaccountably none of the findings of fact state such inferences or take them into account. By their incompleteness in this respect all of the findings of fact as to Rogers' liability are clearly erroneous. In each of the instances of securities fraud just enumerated, an inference may be drawn from Rogers' silence. His silence may be read as confirmatory of his cooperation in the use of his name as a tax expert in the GFTD advertising; his silence may be seen to confirm his intentional or reckless use of Kittredge's false material; his silence leaves unchallenged the evidence of his participation in preparing the tax opinion. The district court clearly erred in not taking these inferences into account.

The district court also refused on May 13, 1982 to open the record to permit the SEC to take the deposition of Mireya Uribi Prada. The court had before it shadowy corporations whose default foreclosed investigation of their constituent parts. The actual existence of their officers had been called into question. Uribi Prada was the secretary of IME, the only corporate officer who was not a phantom. Her testimony could have cast much light on these matters which were highly germane to Rogers' liability. The district court refused to wait for her testimony, yet waited until March 4, 1985 to decide the case. Such a course of action is a clear abuse of discretion and is itself grounds for reversal of the judgment.

I would REVERSE and REMAND.